[L.A. No. 30307. In Bank. Jan. 7, 1975.]

RICHARD BOZUNG et al., Plaintiffs and Appellants, v.
LOCAL AGENCY FORMATION COMMISSION OF VENTURA
COUNTY et al., Defendants and Respondents;
KAISER AETNA, Real Party in Interest and Respondent;
CITY OF THOUSAND OAKS, Intervener and Respondent.

## COUNSEL

Carlyle W. Hall, Jr., Mary D. Nichols, John R. Phillips, Brent N. Rushforth and Fredric P. Sutherland for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, Nicholas C. Yost and Norman N. Flette, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Dorothy L. Schechter, County Counsel, James L. McBride, Chief Assistant County Counsel, Burke, Williams & Sorensen and Royal M. Sorensen for Defendants and Respondents.

John H. Larson, County Counsel (Los Angeles), David D. Mix, Assistant Chief Deputy County Counsel, and John W. Whitsett, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Respondents.

Cohen, Whitfield & Osborne, Stanley E. Cohen and James L. Spencer for Real Party in Interest and Respondent.

Raymond C. Clayton, City Attorney, Hathaway, Clabaugh, Perrett & Webster and E. E. Clabaugh, Jr., for Intervener and Respondent and as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**THE COURT.**—In this action for mandate and declaratory relief, a number of Ventura County residents and taxpayers seek to establish that the provisions of the California Environmental Quality Act require a Local Agency Formation Commission to prepare and certify an environmental impact report prior to approving a city's annexation of property intended for future development. After decision by the Court of Appeal, Second Appellate District, Division Five, reversing a judgment for defendants after their demurrers to the complaint were sustained without leave to amend, we granted a hearing in this court for the purpose of giving further consideration to the issues raised. Having made a thorough examination of the cause, we have concluded that the opinion of the Court of Appeal prepared by Presiding Justice Kaus and concurred in by Justices Hastings and Stephens correctly treats and disposes of the issues involved and we adopt such opinion as and for the opinion of this court. Such opinion (with appropriate deletions and additions) is as follows:*

---

*Brackets together, in this manner [ ] *without enclosing material,* are used to indicate deletions from the opinion of the Court of Appeal; brackets *enclosing material* (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (See *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases there cited.)

The significant issue in this appeal is whether the California Environmental Quality Act (CEQA) applies to the approval of annexation proposals by a Local Agency Formation Commission (LAFCO), where property development is intended to follow the annexation approval and annexation.

The action challenges the validity of an annexation by the City of Camarillo of about 677 acres, known as the Bell Ranch.[1] The plaintiffs[2] are: Richard Bozung, a Ventura County resident and taxpayer; Roger Boedecker, a Ventura County resident and taxpayer who lives near the annexed property, on behalf of himself and all others similarly situated; and the Ventura County Environmental Coalition, Ventura County residents and taxpayers, many of whom live in Camarillo or in the area of the annexation. The Attorney General has filed an amicus brief in support of plaintiffs on the central issue, the applicability of CEQA to LAFCOs.

The defendants are: The Ventura County Local Agency Formation Commission (LAFCO), which approved the annexation proposal, and the City of Camarillo (Camarillo). The real party in interest is Kaiser Aetna (Kaiser), which owns the Bell Ranch. The City of Thousand Oaks filed a complaint in intervention, and, on appeal, an amicus brief on behalf of defendants.

FACTS

In 1963 the Legislature established in each county a countywide local agency formation commission (LAFCO). (Knox-Nisbet Act., Gov. Code, §§ 54773-54779.5; see Stats. 1963, ch. 1808, § 1.) One of a LAFCO's purposes is to encourage the orderly formation and development of local governmental agencies based on local conditions and circumstances. (Gov. Code, § 54774.) One of its duties is to approve or disapprove all annexation proposals submitted by cities within the county. (Gov. Code, § 54790.)

In 1967 LAFCO considered the development of "spheres of influence" for Ventura County, held public hearings and eventually, in January

---

[1]The territory annexed also includes two small separately owned properties which would otherwise have created an island of unincorporated territory. When we refer to the "annexation" we mean the annexation as contained in Camarillo Ordinance Number 221, adopted July 26, 1972.

[2]Although this is a petition for a writ of mandate, for convenience we refer to the petitioners as plaintiffs, and respondents as defendants.

1968, adopted a "spheres of influence plan." Later, effective 1972, the Legislature amended the Knox-Nisbet Act to require that each LAFCO develop a spheres of influence plan. (Gov. Code, § 54774.)

Under the 1968 spheres of influence plan, Kaiser's property straddled the Las Posas and Camarillo spheres of influence. Las Posas then was, and still is, an unincorporated area. In August 1970 Kaiser was planning to develop property which included the Bell Ranch and requested LAFCO to readjust the spheres of influence. This was the first official notice that Kaiser intended to subdivide the ranch. In September 1970, after hearings, LAFCO approved a shift of the spheres of influence lines so that the Bell Ranch property fell into the Las Posas sphere.

In October 1970 Kaiser requested the county to rezone 384.91 acres of its property. Apparently this request was denied or withdrawn.[3]

LAFCO then held various hearings concerning the Las Posas sphere of influence. In October 1971 LAFCO shifted the sphere of influence line so that the Bell Ranch land came within the Camarillo sphere.

In April 1972, Camarillo and Kaiser petitioned LAFCO to approve Camarillo's proposed annexation of 677 acres of the Bell Ranch. Vital to our disposition of this case is that Kaiser's application stated that the land was presently used for agriculture and would be used "for

---

[3]A statement from which we quote in part accompanied the request: "Rancho Ventura, a project of Kaiser Aetna, comprises 10,000 acres of land located in the Las Posas Valley in Ventura County. The objective of Kaiser Aetna is to acquire land, upgrade the land to a higher use, and sell it for a specific use. . . .

"The Master Plan for the entire 10,000 acres of Rancho Ventura property is nearing completion. Area and site planning has been undertaken to better define certain areas with the overall Master Plan. The Master Plan for the initial urban core area has been completed. It comprises 1177 acres and is located generally to the north of Las Posas Road, extending northerly to Los Angeles Avenue. It has been master planned specifically as a self-contained urban development complete with all urban services. A majority of the first phase development anticipated by the Rancho Ventura management will occur within this urban core area.

"Recently LAFCO has reaffirmed its position supporting the formation of the new City of Las Posas. . . .

"The Rancho Ventura staff agrees in principle with the concept of the Planned Community zone but, since it is not presently in existence, we must request zone changes, circulation element changes and adoption of our Master Plan. However, because of the possibility of the Planned Community zone being completed within the next year, Rancho Ventura has limited the area of the request to the minimum area Phase 1 development in anticipation of ultimately having the entire development operating under the Planned Community zone."

residential, commercial and recreational uses," and that such development was "anticipated . . . in the near future."[4]

On June 14, 1972, LAFCO adopted a resolution approving the proposed annexation. On July 26, 1972, Camarillo adopted an ordinance annexing the Bell Ranch to the city. Pursuant to Government Code section 35316, the ordinance was forwarded to the Secretary of State for filing. It was filed not earlier than August 28, 1972.

Additional facts will be developed in the discussion.

Plaintiffs filed this action on August 24, 1972. It contains six causes of action—five in mandate, one, the second, in declaratory relief. It prays for a writ of mandate to compel LAFCO to set aside its annexation approval and to prevent Camarillo from enacting the annexation ordinance. The various causes of action turn on the applicability of CEQA to LAFCO annexation approvals, and the duties of LAFCO under Knox-Nisbet to develop spheres of influence within the county and to approve annexation proposals. Defendants each filed both demurrers and answers. The answers indicate that the essential facts bearing on substantive matters are not disputed. In essence defendants deny all allegations of either duty or breach of duty, or both, as appropriate. The answers, therefore, do not really tender any factual issues; they did not become operative only because the trial court sustained the demurrers without leave to amend. The appeal is from the ensuing judgment.[5]

[4]The application contained Camarillo's and Kaiser's answers to a standard questionnaire. Certain significant questions and answers were as follows: "[Q.] What is the present use of the land? [A.] Land is in agricultural use and is also the site of two churches and the City of Camarillo water storage facility.

"[Q.] How will the land be used after annexation? Please be specific. [A.] Proposed for residential, commercial and recreational uses.

" . . . . . . . . . . . . . . . .

"[Q.] Why is the annexation being proposed at this time, rather than earlier or at some time in the future? [A.] Planning is completed and preliminary conferences with city agencies have progressed sufficiently.

"[Q.] Has any proponent included only a portion of the land under his ownership? *yes* If 'Yes' please explain. [A.] Proponent has included those properties anticipated to be developed in the near future.

" . . . . . . . . . . . . . . . .

"[Q.] Will the proposed annexation result in urban growth in the area to be annexed or in areas adjacent to the proposed annexation? [Please be specific.] [A.] Urban growth will take place in designated areas and only within the annexation."

[5]While the appeal was pending [in the Court of Appeal] plaintiffs applied to [that] court for a writ of supersedeas. On August 2, 1973, [the Court of Appeal] issued a stay

ISSUES

Although the parties generally agree about the sequence of events, they agree about virtually none of the legal consequences. In the order in which we reach the issues, they disagree (1) whether the annexation may be challenged by mandate, which in turn depends on the question when the annexation was legally complete; (2) whether any one of the three plaintiffs has standing to bring the action; (3) whether a class action is proper; (4) whether CEQA applies to LAFCO approval of annexations; (5) what constitutes compliance with the requirement that LAFCO established a "spheres of influence" plan; and (6) what factors must be considered before a LAFCO may approve an annexation.

I

We first discuss several issues which pertain to all or nearly all of the causes of action.

*Propriety of Mandate*

The annexation ordinance was adopted by Camarillo on July 26, 1972. Plaintiffs' petition was filed on August 24, 1972, and an alternative writ of mandate was issued that day. The ordinance was filed by the Secretary of State on August 28 or 29, 1972. Defendants contend that mandate is not the proper remedy, because the annexation was "complete." "[Q]uo warranto is the proper remedy to attack a completed annexation proceeding, mandamus lies to terminate an incomplete proceeding." (5 Witkin, Cal. Procedure (2d ed. 1971) § 20, p. 3794.)[6]

Defendants' contention is without merit. "Annexation proceedings are not complete before the filing by the Secretary of State of a certified

order, restraining the issuance of any conditional use permits, building permits or grading permits in the territory annexed.

Certain undisputed facts respecting developments after the filing of the complaint below appear from the petition for supersedeas and the opposition filed thereto by Kaiser and Camarillo. These facts were, of course, not before the trial court. They do, however, illuminate certain issues to be discussed and we shall refer to them from time to time.

[6]The difference between quo warranto and mandamus is no mere quibble. Quo warranto must be brought by the Attorney General, on "his own information, or upon a complaint of a private party . . . ." (Code Civ. Proc., § 803.) For what it is worth, as we have noted, the Attorney General has filed an amicus curiae brief on behalf of plaintiffs in support of their cause of action alleging that LAFCO's approval of the proposed annexation violated CEQA.

copy of the ordinance approving annexation after the lapse of a 30-day period subsequent to the adoption by the city council of an ordinance to that effect. (Gov. Code, § 36937.) (See: Gov. Code, §§ 35316, 35317, and 35318.)" (*Guerrieri* v. *City of Fontana,* 232 Cal.App.2d 417, 419 [42 Cal.Rptr. 781].) Whether for other purposes an annexation may be complete at an earlier date is beside the point. Mandamus will lie to challenge an annexation before it is final within the definition of the Government Code. (*Norlund* v. *Thorpe,* 34 Cal.App.3d 672, 676 [110 Cal.Rptr. 246]; see *Hazelton* v. *City of San Diego,* 183 Cal.App.2d 131, 135 [6 Cal.Rptr. 723].)

### *Plaintiffs' Standing*

■ Defendants contend that none of the plaintiffs has standing to bring this action because each lacks the "beneficial interest" required to bring an action in mandamus. We disagree. Plaintiff Boedecker is a Ventura County taxpayer and resident who lives about 1,800 feet from the annexed property; he had a very real and substantial interest in the challenged proceedings. (Cf. *Scott* v. *City of Indian Wells,* 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137].) Plaintiffs Bozung and the Ventura County Environmental Coalition have alleged that they will be harmed by the environmental effects of the challenged annexation; that allegation is sufficient. (*United States* v. *SCRAP* (1973) 412 U.S. 669, 683-685 [37 L.Ed.2d 254, 268-269, 93 S.Ct. 2405].) Moreover, plaintiffs have standing "to procure enforcement of a public duty, . . ." (*Kappadahl* v. *Alcan Pacific Co.,* 222 Cal.App.2d 626, 643 [35 Cal.Rptr. 354].)

We do not perceive the significance attributed by defendants to whether plaintiffs live within or without the Camarillo city boundaries. Effects of environmental abuse are not contained by political lines; strict rules of standing that might be appropriate in other contexts have no application where broad and long-term effects are involved. (See *United States* v. *SCRAP, supra,* 412 U.S. at pp. 687-688 [37 L.Ed.2d at pp. 269-270].)

### *Class Action*

(3) Plaintiff Boedecker brought the action on behalf of himself and "all other property owners and taxpayers similarly situated." Defendants contend that this is not a proper class action; we agree.

The various purposes of a class action are discussed in *Vasquez* v. *Superior Court,* 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]: "[A] therapeutic effect upon those sellers who indulge in fraudulent practices . . . avoidance to the judicial process of the burden of multiple litigation involving identical claims" (4 Cal.3d at p. 808); avoidance of "manifold burdens on the parties" and the impracticability of individual actions because of the amounts involved (*id.,* at p. 810). None of these purposes is served in this case. "All others similarly situated" will automatically benefit from Boedecker's efforts herein whether or not they are joined in the action.[]

## II

The core of this case is reached in the fifth cause of action in which it is claimed that CEQA applies to the LAFCO annexation approval in question, and that defendant LAFCO violated its duty by failing to prepare an Environmental Impact Report (EIR) in conformance with CEQA before holding hearings on and approving the proposed annexation.

Admittedly the annexation proceeded as if CEQA did not exist.

The resolution of this issue involves integrating the provisions of CEQA (Pub. Resources Code, § 21000 et seq.) with those of Knox-Nisbet (Gov. Code, § 54773 et seq.) which governs the formation and duties of LAFCOs. (See generally *City of Ceres* v. *City of Modesto,* 274 Cal.App.2d 545, 550-553 [79 Cal.Rptr. 168].)

Generally, a LAFCO accomplishes its objectives in two ways. First—though not compelled to do so until an amendment to Knox-Nisbet in 1971, effective 1972—it develops the sphere of influence of each local governmental agency within the county. (Gov. Code, § 54774.) The factors that a LAFCO is required to consider include such clearly environment-oriented considerations as "projected future population growth," "type of development," and "existence of social and economic interdependence and interaction . . . ." There is nothing final about a spheres of influence plan. Only the "probable" boundaries of local governmental agencies must be established; the LAFCO must "periodically review and update the spheres of influence . . . ." (Gov. Code, § 54774.)

However, the spheres of influence plan is intended as the basis for LAFCO involvement in county development. Section 54774 provides

that the "spheres of influence, after adoption, shall be used by [LAFCO] as a factor in making regular decisions on proposals over which it has jurisdiction."

The second significant function performed by LAFCO is "to review and approve or disapprove" annexation of territory to local agencies. (Gov. Code, § 54790.) The Legislature has established various factors that LAFCO must consider in reviewing annexation proposals. (Gov. Code, § 54796.) Some of them, such as "population, population density," "topography," "effect . . . on . . . adjacent areas, on mutual social and economic interests . . ." clearly involve environmental considerations; none of them excludes such concerns.

We now turn to the issue whether a LAFCO may ignore CEQA in going about its business, as happened in this case, or whether CEQA and Knox-Nisbet must be harmonized in such a way that the objective common to both acts, the prevention of damage to the environment, will be furthered to the greatest extent which the language of both statutes fairly permits. [7]

It is, of course, too late to argue for a grudging, miserly reading of CEQA. ■ As the 1972 additions and amendments to CEQA prove, [] [we] correctly gauged the legislative intent in *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], when [] [we] concluded that the Legislature intended CEQA "to be interpreted in such manner as to afford the *fullest possible protection* to the environment within the reasonable scope of the statutory language." (Italics added.)

With this mandate in mind, we first catalogue the statutory material with which we are concerned and then apply its particular provisions to the facts of this case.

CEQA consists of three parts: First, the original 1970 legislation. (Generally Pub. Resources Code, §§ 21000-21050, 21100-21106, 21150-21151 [Stats. 1970, ch. 1433, § 1, p. 2780 et seq.].) [8] This is the version of

---

[7] In this effort we must be guided by the principle that "every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." (*Stafford* v. *Realty Bond Service Corp.,* 39 Cal.2d 797, 805 [249 P.2d 241].) This rule applies although the statutes to be harmonized appear in different codes. (*Modesto Irr. Dist.* v. *City of Modesto,* 210 Cal.App.2d 652, 656 [27 Cal.Rptr. 90].)

[8] Unless otherwise indicated, all statutory references are to the Public Resources Code.

CEQA interpreted in *Friends of Mammoth.* Second, the 1972 additions, deletions and amendments (adding Pub. Resources Code, §§ 21060-21090, 21108, 21152-21174) to the 1970 CEQA. (Stats. 1972, ch. 1154, p. 2270 et seq.)[9] Finally, the Guidelines authorized by section 21083 and issued originally February 1973.[10] (Cal. Admin. Code, tit. 14, § 15000 et seq.)

■ All parties to this litigation—except Kaiser—agree that pertinent sections of both the 1970 and the 1972 legislation and of the Guidelines are relevant to a proper determination of the central issue, the applicability of CEQA to Knox-Nisbet. Although the LAFCO action under attack was taken in the summer of 1972, before the 1972 act became effective on December 5 of that year, our examination of the statutes, particularly when read in the light of *Friends of Mammoth,* convinces us that this near-unanimity is justified.

As noted, the lone dissenter is Kaiser, which contends that the pertinent portions of the 1972 amendments do not apply. For reasons set forth in the footnote, we do not agree.[11]

We now turn to specifics. Needless to say, the mood of our examination must be in the spirit of the legislative findings and state

---

[9]An excellent summary of the relationship between the 1970 legislation, *Friends of Mammoth,* and the 1972 act will be found in Seneker, *The Legislative Response to Friends of Mammoth* (1973) 48 State Bar J. 127.

[10]The Guidelines were amended in December 1973 (Cal. Admin. Register 1973, No. 50.) We quote from the current version.

[11]Kaiser's problem is Public Resources Code, section 21065, added in 1972, which defines "project." The definition appears in section 1 of the 1972 Act, section 17 of which reads as follows: "The Legislature finds and declares that Section 1 of this act is intended to clarify existing provisions of the Environmental Quality Act of 1970 and thereby to facilitate and to promote uniform administration of the Environmental Quality Act of 1970 throughout the state. It is therefore the intent of the Legislature in enacting Section 1 of this act only to declare and to clarify existing law." (See § 21060.)

Kaiser argues that "Courts cannot accept a legislative statement that unmistakable changes in the statute are nothing more than a clarification or restatement of its original term." True, but there is no change, unmistakable or disguised. Kaiser merely points to the fact that the definition of "project" contained in section 21065 does not embody the concept that the project must culminate in a physical change in the environment, demanded by the 1970 act as interpreted in *Friends of Mammoth.* This is misleading. The 1970 act did not even purport to define "project." *Friends of Mammoth* was an interpretation of section 21151 calling for EIRs on "any project . . . which may have a significant effect on the environment. . . ." That precise language of section 21151 was retained by the 1972 act which amended the section in other particulars not relevant at this point.

policies set forth in sections 21000 and 21001.[12] In view of the precise issue before us, we must particularly respect subdivision (f) of section 21001, which requires "governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality."

■ The first question then is whether LAFCO is a governmental agency to which CEQA addresses itself. Any conceivable doubt on that score is removed by sections 21062 and 21063[13] quoted in the margin.

The section of CEQA on which plaintiffs rest their case and which defendants claim to be inapplicable to LAFCO is section 21151 which

---

[12]Section 21000: "The Legislature finds and declares as follows: (a) The maintenance of a quality environment for the people of this state now and in the future is a matter of statewide concern. (b) It is necessary to provide a high-quality environment that at all times is healthful and pleasing to the senses and intellect of man. (c) There is a need to understand the relationship between the maintenance of high-quality ecological systems and the general welfare of the people of the state, including their enjoyment of the natural resources of the state. (d) The capacity of the environment is limited, and it is the intent of the Legislature that the government of the state take immediate steps to identify any critical thresholds for the health and safety of the people of the state and take all coordinated actions necessary to prevent such thresholds being reached. (e) Every citizen has a responsibility to contribute to the preservation and enhancement of the environment. (f) The interrelationship of policies and practices in the management of natural resources and waste disposal requires systematic and concerted efforts by public and private interests to enhance environmental quality and to control environmental pollution. (g) It is the intent of the Legislature that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage."

Section 21001: "The Legislature further finds and declares that it is the policy of the state to: (a) Develop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state. (b) Take all action necessary to provide the people of this state with clean air and water, enjoyment of aesthetic, natural, scenic, and historic environmental qualities, and freedom from excessive noise. (c) Prevent the elimination of fish or wildlife species due to man's activities, insure that fish and wildlife populations do not drop below self-perpetuating levels, and preserve for future generations representations of all plant and animal communities and examples of the major periods of California history. (d) Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions. (e) Create and maintain conditions under which man and nature can exist in productive harmony to fulfill the social and economic requirements of present and future generations. (f) Require governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality. (g) Require governmental agencies at all levels to consider qualitative factors as well as economic and technical factors and long-term benefits and costs, in addition to short-term benefits and costs and to consider alternatives to proposed actions affecting the environment."

[13]Section 21062: " 'Local agency' means any public agency other than a state agency, board, or commission. For purposes of this division a redevelopment agency is a local agency, and not a state agency, board or commission."

Section 21063: " 'Public agency' includes any state agency, board, or commission, any county, city and county, city, regional agency, public district, redevelopment agency, or other political subdivision."

requires "all local agencies" to prepare and certify an EIR "on any project they intend to carry out or approve which may have a significant effect on the environment."[14]

No sensible argument can be made that section 21151 need not concern LAFCO if the LAFCO activity under examination in this case is a "project" as defined by CEQA and the Guidelines.

The definition of "project" is contained in section 21065, which reads in relevant part as follows: " 'Project' means the following: (a) Activities directly undertaken by any public agency . . . (c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

The definition of "person" includes "city." (§ 21066.)[15]

Plaintiffs and the Attorney General contend that the LAFCO activity relating to the Bell Ranch annexation is a "project" under both subdivisions (a) and (c) of section 21065.[16]

---

[14]That, of course, is the very section interpreted and applied in *Friends of Mammoth*. (8 Cal.3d at pp. 259-266.)

[15]Section 21066: " 'Person' includes any person, firm, association, organization, partnership, business, trust, corporation, company, district, county, city and county, city, town, the state, and any of the agencies and political subdivisions of such entities."

[16]The Guidelines further define "project": and "(a) Project means the whole of an action, resulting in physical impact on the environment, directly or ultimately, that is any of the following: [¶] (1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities, clearing or grading of land, improvements to existing public structures, *enactment and amendment of zoning ordinances, and the adoption of local General Plans or elements thereof* . . . [¶] (3) An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies. [¶] (b) Project does not include: [¶] . . . (3) . . . general policy and procedure making (except as they are applied to specific instances covered above), *feasibility or planning studies.* . . ." (Cal. Admin. Code, tit. 14, § 15037. Italics added.)

The Guidelines' definition of "project" is somewhat narrower than the Legislature's. CEQA itself proceeds on a step-by-step basis, by first defining "project" so broadly that it covers activities having no conceivable effect on the environment. (§ 21065.) Then CEQA declares to what projects the act applies, including in the open-ended definition of discretionary projects "the enactment and amendment of zoning ordinances." (§ 21080.) Finally, CEQA directs what the agencies addressed must do when dealing with projects "which may have a significant effect on the environment." (§§ 21100, 21150.) The Guidelines (Cal. Admin. Code, tit. 14, § 15037) consolidate this gradual statutory narrowing in the very definition of "project," by excluding any project which will not "directly or ultimately" result in physical impact on the environment, as well as matters such as "feasibility or planning studies."

Subdivision (c), added in December 1973 merely clarifies this approach. By stating that project "refers to" the underlying activity, it focuses attention on that which has impact on the environment. Otherwise a reader of the Guidelines' definitions might overlook

Defendants point to the fact that "feasibility and planning studies" are excluded from the Guidelines' definition of "project" and contend that LAFCO approval of a specific annexation proposal is more like a feasibility or planning study than the enactment or amendment of a zoning ordinance or the adoption of a local general plan.

The fact is that if the adoption of a general plan is a project, as the Guidelines provide, an annexation approval by a LAFCO becomes an a fortiori case.[17] ■ While a general plan "is by its very nature merely tentative and subject to change" (*Selby Realty Co. v. City of Buenaventura,* 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111]), a LAFCO approval of an annexation is an irrevocable step as far as that particular public agency is concerned.

Defendants make the point that such an approval is merely permissive and does not compel the city to annex. That observation would be pertinent if it were plaintiffs' position that every LAFCO approval of every annexation necessarily "may have a significant effect on the environment," the condition which calls for the preparation of an EIR under section 21151.[18] That is a separate issue with which we deal below. Right now the only question is whether such an approval is a "project" within the meaning of section 21065.

We agree with plaintiffs and the Attorney General that an approval of an annexation to a city is covered both by subdivision (a) and subdivision (c) of section 21065. It is covered by subdivision (a) because it obviously is an activity directly undertaken by a public agency. It is covered by subdivision (c) because it involves the issuance to a "person"

---

that governmental paper-shuffling such as the enactment of a zoning ordinance or the adoption of a general plan are projects if, in the section's own words, they "directly or ultimately" result in physical impact on the environment, or that, conversely, they are not projects within the Guidelines' definition, if the underlying activity has no direct or ultimate environmental impact.

The Guidelines' approach and choice of words are perhaps not as clear as they might be. We must keep in mind, however, that any other interpretation of subdivision (c) would make a shambles of CEQA, the Guidelines—including the balance of section 15037 itself—and *Friends of Mammoth* which (see fn. 19, *infra*) itself involved no "underlying activity."

[17]For the relationship between general plans and zoning ordinances, see section 65860 of the Government Code.

[18]At this point it is appropriate to note a legislative change to the wording of section 21151 made in 1972 which actually has less significance than may appear, because it merely codifies the *Friends of Mammoth* interpretation of section 21151 as enacted in 1970. The pertinent part of the section originally referred to local agencies having to prepare EIRs "on any project they intend to carry out . . . ." The 1972 act added the words *"or approve."* (Italics added.)

as defined in section 21066, that is to say, a city, of an entitlement for use. That, in theory, the city eventually may not use the entitlement by not annexing, does not retroactively turn a project into a nonproject.[19]

█ We therefore hold that a LAFCO approval of a city annexation is a project within the meaning of subdivisions (a) and (c) of section 21065.[20]

The next question is whether LAFCO was required to prepare and certify an EIR because its "project" was one "which may have a significant effect on the environment." (§ 21151.)

The notion that the project itself must directly have such an effect was effectively scotched in *Friends of Mammoth.* The granting of a conditional use permit—a piece of paper—does not directly affect the environment any more than an annexation approval—another piece of paper. *Friends of Mammoth,* of course, said that the word " 'project' appears to emphasize activities *culminating* in physical changes to the environment, . . ." (*Id.* at p. 265. Italics added.) In response to that concept, the Guidelines refer to "physical impact on the environment, directly or *ultimately.*" (Cal. Admin. Code, tit. 14, § 15037. Italics added.) The Guidelines then proceed to set forth, in great detail, what considerations are relevant to a finding of a "significant effect." The key sections are set forth in the margin.[21] The Guidelines even provide for a "negative declaration" for projects "which could potentially have a significant effect on the environment," but which the public agency finds, on an

---

[19]*Friends of Mammoth* did not involve, as is popularly believed, a building or grading permit which entitled the owner of the land in question to start moving dirt. The decision concerned itself merely with an application for a conditional use permit addressed to the Mono County Planning Commission. (8 Cal.3d 247, 252.) The effect of that body's action was merely to zone the land for the improvement—two multi-story structures containing 184 living units—contemplated. Just as a city may change its mind about an annexation, so may a property owner never go through with a contemplated project.

[20]Since we agree with the legislative declaration that section 21065 merely clarifies the provisions of the 1970 act as interpreted in *Friends of Mammoth,* and hold that the annexation approval is a project within the meaning of subdivisions (a) and (c), and, since this proceeding was filed on August 24, 1972, before the 1972 act became effective, and states a cause of action for a violation of CEQA, we need not discuss the rather complex "grandfather" provisions of sections 21169 and 21170, which, in any event, only apply to projects defined in subdivision (c).

[21]"(a) The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An iron clad definition of significant effect is not possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area. There may be a difference of opinion on whether a particular effect should be considered adverse or beneficial, but where there is, or anticipated to be, a substantial body of opinion that considers or will consider the effect to be adverse, the lead agency

initial study, to have no such effect. Even such a negative declaration must be filed in time to give the public an opportunity to respond before the project to which it relates is approved.[22]

should prepare an EIR to explore the environmental effects involved. [¶] (b) In evaluating the significance of the environmental effect of a project, the lead agency shall consider both primary or direct and secondary or indirect consequences. Primary consequences are immediately related to the project (the construction of a new treatment plant may facilitate population growth in a particular area), while secondary consequences are related more to primary consequences than to the project itself (an impact upon the resource base, including land, air, water and energy use of the area in question may result from the population growth). [¶] (c) Some examples of consequences which may have a significant effect on the environment in connection with most projects where they occur, include a change that: [¶] (1) Is in conflict with environmental plans and goals that have been adopted by the community where the project is to be located; [¶] (2) Has a substantial and demonstrable negative aesthetic effect; [¶] (3) Substantially affects a rare or endangered species of animal or plant, or habitat of such a species; [¶] (4) Causes substantial interference with the movement of any resident or migratory fish or wildlife species; [¶] (5) Breaches any published national, state, or local standards relating to solid waste or litter control; [¶] (6) Results in a substantial detrimental effect on air or water quality, or on ambient noise levels for adjoining areas; [¶] (7) Involves the possibility of contaminating a public water supply system or adversely affecting ground water; [¶] (8) Could cause substantial flooding, erosion or siltation; [¶] (9) Could expose people or structures to major geologic hazards." (Cal. Admin. Code, tit. 14, § 15081.)

"In every case where any of the following conditions are found to exist as a result of a project, the project shall be found to have impacts with a significant effect on the environment: [¶] (a) Impacts which have the potential to degrade the quality of the environment or curtail the range of the environment. [¶] (b) Impacts which achieve short-term, to the disadvantage of long-term, environmental goals. A short-term impact on the environment is one which occurs in a relatively brief, definitive period of time while long-term impacts will endure well into the future. [¶] (c) Impacts for a project which are individually limited, but cumulatively considerable. A project may affect two or more separate resources where the impact on each resource is relatively small. If the effect of the total of those impacts on the environment is significant, an EIR must be prepared. This mandatory finding of significance does not apply to two or more separate projects where the impact of each is insignificant. [¶] (d) The environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (Cal. Admin. Code, tit. 14, § 15082.)

[22]"(a) A Negative Declaration shall be prepared for a project which could potentially have a significant effect on the environment, but which the lead agency finds on the basis of an Initial Study will not have a significant effect on the environment. [¶] (b) A Negative Declaration must include a brief description of the project as proposed, a finding that the project will not have a significant effect on the environment, a brief statement of reasons to support the findings, and a statement indicating who prepared the initial study and where a copy of it may be obtained. The Negative Declaration should normally not exceed one page in length. [¶] (c) The Negative Declaration shall be made available to the public with sufficient time before the project is approved to provide an opportunity for members of the public to respond to the finding. [¶] (d) After making a decision to carry out or approve the project, the lead agency shall file a Notice of Determination with a copy of the Negative Declaration attached. The Notice of Determination shall include the decision of the agency to approve or disapprove the project, the determination of the agency whether the project will have a significant effect on the environment and a statement that no EIR has been prepared pursuant to the provisions of CEQA." (Cal. Admin. Code, tit. 14, § 15083.)

. █ Applying the letter and the spirit of sections 21000 and 21001 of CEQA and the particular criteria set forth in the Guidelines to the case at hand, [] [we think it is] clear [and] beyond doubt that the LAFCO approval of the annexation of 677 acres involved in this case may have a significant effect on the environment. First and foremost, we point out that we are not dealing with an abstract problem. Again, this case does not involve—as the tone of some of defendants' arguments suggest—the question whether any LAFCO approval of any annexation to any city may have a significant effect on the environment. This is not the case of a rancher who feels that his cattle would chew their cuds more contentedly in an incorporated pasture. No one makes any bones about the fact that the impetus for the Bell Ranch annexation is Kaiser's desire to subdivide 677 acres of agricultural land, a project apparently destined to go nowhere in the near future as long as the ranch remains under county jurisdiction. The city's and Kaiser's application to LAFCO shows that this agricultural land is proposed to be used for "residential, commercial and recreational" purposes. Planning was completed, preliminary conferences with city agencies had progressed "sufficiently" and development in the near future was anticipated. In answer to the question whether the proposed annexation would result in urban growth, the city answered: "Urban growth will take place in designated areas and only within the annexation."[23]

It therefore seems idle to argue that the particular project here involved may not culminate in physical change to the environment.[24]

Since the obvious is so frequently overlooked, we think it is appropriate to emphasize it: We stated at the outset that LAFCO proceeded as

---

[23]It would be entirely wrong to infer that there is anything underhanded or illegal in this pre-annexation cooperation between Kaiser and Camarillo. Government Code section 65859 specifically provides for the prezoning of unincorporated territory adjoining a city "for the purpose of determining the zoning that will apply to such property in the event of subsequent annexation . . . ." Nor do we mean to imply that Camarillo has somehow bargained away its responsibilities with respect to such decisions as must be made before Kaiser's plans can become a reality.

[24]To illustrate: Kaiser's and Camarillo's opposition to plaintiff's petition for supersedeas showed that on December 22, 1972, Kaiser requested the city to change the zoning of 28.16 of the 677 acres. The planned development will result in a density of about 144 dwelling units on just those 28.16 acres of agricultural land. An EIR which was before the city in the summer of 1973 indicated that the total ultimate population of "Bell Ranch Village" was to be about 8,000, living in about 3,700 dwelling units.

The 28.16 acres alone were to contribute an estimated 991 pounds of vehicle emissions per day. The total daily emissions for Camarillo were then estimated at 31.79 tons and for the entire County of Ventura, 590 tons. Simple arithmetic tells us that the total daily emissions from the 677 acres of the Bell Ranch would be nearly 22,000 pounds or 11 tons.

if CEQA did not exist. The entire thrust of our discussion is that LAFCO must recognize that Knox-Nisbet dovetails with CEQA. This does not mean that after consideration of an adequate EIR, LAFCO must withhold its approval of the annexation. Any such conclusion would be wildly outside of the scope of the issues tendered in this litigation. We merely enforce the legislative mandate that before acting, LAFCO was bound to address itself to environmental considerations in accordance with the procedures set forth in CEQA.

Kaiser, Camarillo, LAFCO and City of Thousand Oaks present several arguments why the clear mandate of CEQA somehow does not apply here.

The basic contention, in effect, is that an EIR at the stage of a LAFCO annexation approval is premature and wasteful, since—at least in this case—a further EIR will be required before Camarillo can actually rezone the Bell Ranch. Again defendants point to the exemption contained in CEQA relating to projects "involving only feasibility or planning studies for possible future actions . . . ." (§ 21102.) We have already dealt with that argument when considering the definition of "project." Obviously an annexation approval is a reality, not a "possible future action."

It is claimed that the preparation of an EIR for LAFCO would be wasteful and premature since Camarillo will have to prepare another EIR in order to rezone the annexed property. Conceding for the sake of argument only that this is so, it misses the entire thrust of CEQA which requires governmental agencies "at all levels" to consider environmental factors. Obviously it is desirable that the precise information concerning environmental consequences which an EIR affords be furnished and considered at the earliest possible stage. The Guidelines express this principle in a variety of ways. Thus, "EIR's should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design." (Cal. Admin. Code, tit. 14, § 15013.)

In listing the criteria to determine the identity of the "lead agency"—a concept to which we return below—the Guidelines provide that if more than one public agency meets the criteria, "the agency which is to act first on the project in question shall be the lead agency *(following the principle that the environmental impact should be assessed as early as possible in governmental planning."* (Cal. Admin. Code, tit. 14, § 15065, subd. (c). Italics added.)

A vital provision of the Guidelines (Cal. Admin. Code, tit. 14, § 15142)[25] stresses that an EIR must describe the environment from both a local "and regional" perspective and that knowledge of the regional setting is critical to the assessment of environmental impacts. It directs special emphasis on environmental resources peculiar to the region and directs reference to projects, existent and planned, in the region so that the cumulative impact of all projects in the region can be assessed. While, of course, a city is not necessarily incompetent to prepare and evaluate an EIR complying with section 15142, obviously a LAFCO must be presumed to be better qualified on both scores.

More to the point, though, is this critical consideration: The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations. At the very least, however, the People have a right to expect that those who must decide will approach their task neutrally, with no parochial interest at stake. Of course, we do not impugn the motives and integrity of the officials of the particular city involved in the present dispute. Speaking generally, therefore, it seems clear that the officials of a municipality, which has cooperated with a developer to the extent that it requests an annexation of that developer's property for the express purpose of converting it from agricultural land into an urban subdivision, may find it difficult, if not impossible, to put regional environmental considerations above the narrow selfish interests of their city.[26]

One final overwhelming consideration which militates against deferring the preparation and consideration of an EIR until the proposed development reaches the city level is the mandate of CEQA that environmental considerations do not become submerged by chopping a

---

[25]"An EIR must include a description of the environment in the vicinity of the project, as it exists before commencement of the project, from both a local and regional perspective. Knowledge of the regional setting is critical to the assessment of environmental impacts. Special emphasis should be placed on environmental resources that are rare or unique to that region. Specific reference to related projects, both public and private, both existent and planned, in the region should also be included, for purposes of examining the possible cumulative impact of such projects." (Cal. Admin. Code, tit. 14, § 15142.)

[26]The obvious interest of city officials in matters within a LAFCO's jurisdiction is recognized in Knox-Nisbet: "[W]hen the commission is considering a proposal for the annexation of territory to a city of which one of the members of the commission is an officer, the member is disqualified from participating in the proceedings of the commission with respect to the proposal and the alternate member shall serve and vote in his place for such purpose." (Gov. Code, § 54784.)

large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences. This principle is expressed in section 15069 of the Guidelines.[27] The city's statement that Kaiser included in the annexation only "those properties anticipated to be developed in the near future" indicates that at some point Kaiser intends to develop a further part or all of its holdings.[28]

Defendants point out that Knox-Nisbet provides that a LAFCO in approving an annexation, may not "impose any conditions which would directly regulate land use or subdivision requirements." (Gov. Code, § 54790, subd. (a)(3).) We fail to see the relevance. The provision in question merely insures that final zoning decisions are made by the local agencies concerned. It certainly does nothing to detract from the power of a LAFCO to disapprove an annexation if it finds that it violates the detailed criteria which a LAFCO must consider. (Gov. Code, § 54796.) Carried to its logical conclusion, the argument amounts to an assertion that if a city requests the annexation of territory which it has prezoned (Gov. Code, § 65859) LAFCO must approve the annexation for to do otherwise would be to regulate land use.[29] In any event, even complete impotence to approve or disapprove contemplated actions of a local agency does not make the consideration of an EIR by a regional agency an idle act. That was decided in *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.,* 27 Cal.App.3d 695 [104 Cal.Rptr. 197]. There a threshold question before the appellate court was whether the

---

[27]"Where individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the lead agency must prepare a single EIR for the ultimate project. Where an individual project is a necessary precedent for action on a larger project, or commits the lead agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project. Where one project is one of several similar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, but should in either case comment upon the combined effect." (Cal. Admin. Code, tit. 14, § 15069.)

[28]The total record in this case is an excellent illustration of the need for regional environmental consideration at the earliest stage of a planned development before it gains irreversible momentum. As indicated in 1970, Kaiser planned for the ultimate development of 10,000 acres in Ventura County. (See fn. 3, *supra.*) The Bell Ranch annexation involves roughly 1/15th of that total. The zoning application presently pending before Camarillo covers only about 1/24th of that 1/15th or about 1/360th!

[29]In 1972 the Legislature added the following language to Government Code section 54790, subdivision (a)(3): "Nothing in this subsection, however, shall be construed as prohibiting a commission from requiring, as a condition to annexation, that a city prezone the territory to be annexed; provided that the commission shall not specify how or in what manner the territory shall be prezoned." (Stats. 1972, ch. 792, § 2, p. 1410.) It would be ludicrous to argue that LAFCO's lack of power to specify how territory shall be prezoned implies a lack of power to disapprove an annexation of prezoned territory.

plaintiffs should have challenged the adequacy of the EIR by administrative mandamus directed to the county planning commission. The plaintiffs asserted that an injunction against the water district was the proper remedy, because the planning commission had no authority to veto the project. (*Id.* at pp. 702-703.) The court agreed with plaintiff's basic position, and rejected the defendant's contention that the court's decision would make the district's filing of an EIR with the planning commission an idle act: "We do not accept this conclusion. . . . [T]he planning agency by criticism and by adverse comment may persuade the directors of a district to revise an EIR. Revision of a project itself, or even abandonment, may follow, not by the use of any authority of the planning commission which is not given by the act, but by reason of thoughtful reconsideration.

"But the EIR has another function: the informing of the executive and legislative branches of government, state and local, and of the general public of the effect of the project on that revered resource which we call 'The Environment.' " (27 Cal.App.3d at pp. 704-705.)

Finally, defendants make much of the "lead agency" concept in CEQA. "When a project is to be carried out or approved by two or more public agencies, the determination of whether the project may have a significant effect on the environment shall be made by the lead agency and such agency shall prepare . . . the environmental impact report for the project, . . ." (§ 21165.) The lead agency is "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067.)

Defendants assume, of course, that if the lead agency concept applies, that agency is Camarillo, rather than LAFCO.

There are several answers to this contention.

First, the argument assumes that the annexation approval, the zoning change which is in the offing if the annexation is approved, and the actual physical development of the Bell Ranch are all one project. We have however shown that the LAFCO consideration of the proposed annexation is a project all by itself.

Second, as already noted, the Guidelines provide that a method of determining the lead agency is to determine which agency is "to act first

on the project . . . ." (Cal. Admin. Code, tit. 14, § 15065, subd. (c).)[30] It seems highly doubtful that, if a choice between LAFCO and Camarillo has to be made, Camarillo would emerge as the lead agency.

Finally, section 21165 makes it clear that disputes concerning the identity of the lead agency are not to be resolved by one agency looking the other way and the other designating itself: rather they are to be submitted to the Office of Planning and Research which "shall designate the lead agency" which shall prepare the EIR. (§ 21165.)

One last answer to the contention that the preparation of EIRs by LAFCOs would be wasteful in a case such as this because the local agency concerned would have to prepare another EIR before proceeding, is that there is nothing that prevents the local agency, in an appropriate case, from using the EIR prepared by LAFCO, suitably supplemented, as the basis for its decision-making process. The Guidelines provide for such an energy-saving procedure. (Cal. Admin. Code, tit. 14, § 15067.)[31]

To sum up our holding on plaintiffs' fifth cause of action: under the circumstances disclosed by the record the LAFCO approval of the

---

[30]"Where two or more public agencies are involved with a project, which agency shall be the Lead Agency shall be determined by the following principles: [¶] (a) If the project is to be carried out by a public agency, the lead agency shall be the public agency which proposes to carry out the project. [¶] (b) If the project is to be carried out by a nongovernmental person, the lead agency shall be the public agency with the greatest responsibility for supervising or approving the project as a whole. The lead agency will generally be the agency with general governmental powers rather than an agency with a single or limited purpose which is involved by reason of the need to provide a public service or public utility to the project; in such cases, the single or limited purpose agency will, upon request, provide data concerning all aspects of its activities required to furnish service to the project to the agency drafting the EIR, and no separate EIR will be required in regard to such activities. [¶] (c) *Where more than one public agency equally meet the criteria set forth in paragraph (b) above, the agency which is to act first on the project in question shall be the lead agency (following the principle that the environmental impact should be assessed as early as possible in governmental planning).* [¶] (d) Where the provisions of subsections (a), (b), and (c) leave two or more public agencies with an equal claim to be the lead agency, the public agencies may by agreement designate which agency will be the lead agency." (Cal. Admin. Code, tit. 14, § 15065. Italics added.)

[31]"Where an EIR has been prepared, no additional EIR need be prepared unless: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the EIR, due to the involvement of new environmental impacts not considered in a previous EIR on the project; [¶] (b) There are substantial changes with respect to the circumstances under which the project is to be undertaken, such as a change in the proposed location of the project, which will require major revisions in the EIR due to the involvement of new environmental impacts not covered in a previous EIR." (Cal. Admin. Code, tit. 14, § 15067.)

Bell Ranch annexation was invalid because it disregarded the clear impact of CEQA on the LAFCO action. The demurrer should have been overruled. Since the answers on file tendered no serious triable issue, a writ should issue as far as that cause of action is concerned.[32]

## III

Discussion of the balance of plaintiffs' causes of action can be mercifully brief.

### A.

 In their third cause of action plaintiffs allege that LAFCO in approving the Bell Ranch annexation, violated its duty to consider certain of the factors listed in section 54796 of the Government Code, such as the effect of the annexation on the cost and adequacy of services and controls in the annexed and adjacent areas, its effect on "mutual social and economic interests," or its conformity with city or county general plans.

In effect, this cause of action challenges the annexation approval on the hypothesis that LAFCO need not comply with CEQA. As such, the cause of action seems intended as an alternative to the fifth cause of action, to be abandoned should we sustain plaintiffs' position on CEQA, as we do.[33] We therefore deal with it rather summarily.

In brief, we think it states sufficient facts to survive a demurrer. Whether plaintiffs can ever prove it and, if so, by what evidence, is not our concern at this time.

### B.

Plaintiffs' first and second causes of action seek to set aside the annexation on the ground that it was based on an illegally inadequate

---

[32]Our analysis of the answers on file convinces us that, as we said at the outset, they only deny legal conclusions. To the extent that these denials are inconsistent with our views on the law, they raise no triable issues. This observation applies generally to the legal question of plaintiffs' standing, as pleaded, and more particularly to the allegations contained in the fifth cause of action. In addition, however, the answers deny the very existence as taxpayers of plaintiffs Bozung and Boedecker. Official documents of which we take judicial notice convince us, however, that these factual denials are in error. (See *People* v. *Hallman,* 35 Cal.App.3d 638, 641, fn. 1 [110 Cal.Rptr. 891].)

[33]As a practical matter it is inconceivable that an adequate EIR would not cover most of the relevant considerations set forth in section 54796 of the Government Code. (See CEQA, Pub. Resources Code, § 21100, Guidelines, Cal. Admin. Code, tit. 14, § 15140 et seq.)

spheres of influence plan. Knox-Nisbet defines "sphere of influence" as "a plan for the probable ultimate physical boundaries and service area of a local governmental agency." (Gov. Code, § 54774.)

Plaintiffs complain of the fact that LAFCO's plan for Ventura County "includes every acre of Ventura County in the sphere of influence of a presently or prospective existing city."

The point has no merit. ▮▮ There is simply nothing in Knox-Nisbet which positively enjoins wall-to-wall cities in a county if development is in accordance with the safeguards built into Knox-Nisbet and CEQA leads to such a result. What the legislation does seek to accomplish is that at every step along the way the public agencies to whom it is addressed keep the enumerated considerations in mind. Certainly we cannot say that the mere fact that a LAFCO has carved up its entire jurisdiction into "spheres of influence" indicates that it is blind to its responsibilities. The very fact that no unincorporated territory lies outside a designated sphere of influence may promote the orderly growth of cities by discouraging attempts to gobble up unincorporated territory just to be in a better position to lay claim to such land.

## C.

Plaintiffs' fourth cause of action is probably moot in view of our holding with respect to the requirement of an EIR. In any event, it attacks the Bell Ranch annexation without reference to CEQA, on the ground that Knox-Nisbet prohibits "urban sprawl" and the annexation "constitutes urban sprawl as a matter of law."

Again plaintiffs misunderstand the thrust of Knox-Nisbet. One of the purposes of a LAFCO is "the discouragement of urban sprawl." (Gov. Code, § 54774.) However, nothing in Knox-Nisbet orders LAFCO to prohibit it at all costs. LAFCO is an agency with large discretionary powers. ▮▮ The mere fact that a particular LAFCO decision, legally arrived at, permits or results in further urban sprawl, does not give the courts the right to assume the obligations which the Legislature has entrusted to LAFCO. (*Faulkner* v. *Cal. Toll Bridge Authority*, 40 Cal.2d 317, 326 [253 P.2d 659].)

## D.

Plaintiffs' sixth cause of action prays for a writ of mandate directed against Camarillo, enjoining it from enacting an ordinance purporting to

annex the Bell Ranch. That cause of action, too, has become mooted by events and this opinion.

### IV

*Disposition*

Our disposition is influenced by our uncertainty on the question whether plaintiffs intend to press their third cause of action. In any event, on the fifth cause of action, the superior court is directed to overrule the demurrers and, since no factual issue remains to be decided, to issue its writ of mandate in conformity with this opinion. If the third cause of action is pressed, the judgment granting the writ will have to await the trial on the factual issues tendered by the answer to that cause of action.

[] [The judgment is reversed.]

Richardson, J., did not participate therein.

Molinari, J., sitting under assignment by the Chairman of the Judicial Council, participated therein.

**CLARK, J.**—I dissent.

The California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (hereinafter CEQA) should be read to require preparation of an environmental impact report (hereinafter EIR) only for an agency's determination to *limit or authorize* use of land. In considering annexation applications, a local agency formation commission (hereinafter LAFCO) determines questions of political power—i.e., which of several governmental agencies shall regulate an area. The Knox-Nisbet Act creating LAFCO (Gov. Code, § 54773 et seq.) does not give it power to authorize, condition or prohibit development or use of land. Accordingly, LAFCO should not be required to prepare environmental impact reports before determining whether an annexation should be permitted.

#### APPLICATION OF THE CALIFORNIA ENVIRONMENTAL QUALITY ACT

CEQA requires that public agencies "shall prepare, or cause to be prepared . . . an environmental impact report on any project they propose to carry out or approve which may have a significant effect on

the environment." (Pub. Resources Code, §§ 21100, 21151.) In 1972, the Legislature defined "project" in Public Resources Code, section 21065, subdivision (a) to include "[a]ctivities directly undertaken by any public agency," and in subdivision (c) to include "[a]ctivities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

The language of subdivision (a) is so broad as to cover any governmental activity. The mere hiring of governmental employees is an activity directly undertaken by a public agency and thus would ostensibly come within the literal terms. Similarly, the language of subdivision (c) is so broad as to encompass any private activity requiring some form of governmental authorization, including, for example, the licensing of physicians.

Obviously, the Legislature did not intend CEQA to apply to such decisions, and any construction requiring this application would be absurd. Given the breadth of the definition, the majority furnishes no insight by asserting in two paragraphs that the annexation approval comes within the statutory language. Our judicial function requires us to be more searching—to read the act in light of its purposes, other provisions, and this court's decision in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049]. Reading the act in this light demands the conclusion that the EIR requirement applies only to *land development and use activities, and land use regulation resulting in authorization or limitation of land use.*

The Legislature, in first enacting CEQA in 1970, provided only the basic skeletal structure of its present provisions. In *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, the question was whether CEQA applied to private as well as public activities. Pointing out that CEQA, as originally enacted, did not define "project," this court determined on the basis of the act's purposes that CEQA applies not only to instances in which the "government itself engages in *construction, acquisition* or other *developments* but also [to] those instances in which the state regulates private activity." (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at pp. 256-257.) Obviously, the private activity referred to was of the same nature as the enumerated governmental activities, and thus this court established that the act applies to land use determinations.

The interpretation in *Friends of Mammoth* was also based on the guidelines implementing the National Environmental Policy Act. (42

U.S.C. § 4321 et seq.) The federal act applies to federal "actions"; one of the subcategories of "actions" as then defined included "projects and continuing activities." The federal definition of "project" included those "directly undertaken" by federal agencies and those involving a federal "lease, permit, license, certificate or other entitlement for use." (*Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d at pp. 261-262.) Thus it was concluded that "before an environmental impact report becomes required the government must have some minimal link with the activity, either by direct proprietary interest or by *permitting, regulating or funding private activity.*" (*Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d at pp. 262-263; italics added.) The entire discussion of the federal law (8 Cal.3d at pp. 259-267) is within the context of determining whether the act is limited to " 'public works' " and governmental "construction, acquisition, or other development" or extends to private works of that nature. There is no suggestion that the act applies to matters other than land use authorization and regulation.

When in response to the *Friends of Mammoth* decision the Legislature in 1972 adopted the urgency legislation broadly defining "project," it declared its intent "only to declare and to clarify existing law" (Stats. 1972, ch. 1154, § 17) and adopted almost verbatim the words of the federal guidelines relied on in *Friends of Mammoth.*

When the Legislature has declared its intent to adopt the rule of a judicial decision, or when legislation is framed in the language of an earlier enactment which has been judicially construed, there is a strong presumption of intent to adopt the judicial construction. (See *Baldwin* v. *State of California* (1972) 6 Cal.3d 424, 433-434 [99 Cal.Rptr. 145, 491 P.2d 1121]; *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688-689 [8 Cal.Rptr. 1, 355 P.2d 905].) Thus, in the instant case it must be presumed the Legislature in defining "project" intended to adopt the construction given that term in *Friends of Mammoth*, i.e., CEQA applies only when a public agency directly engages in construction, acquisition, or development or when it *regulates* private construction, acquisition, or development.

The intent of the Legislature to incorporate the application given in *Friends of Mammoth* is further shown by Public Resources Code section 21080, subdivision (a), defining the scope of CEQA. This section, merely codifying our holding that CEQA applies to government authorized private construction, states that CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances,

the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps." The enumerated examples all involve governmental regulation authorizing or limiting the use of land.

The function and elements of an EIR also demonstrate the emphasis on land development and land use regulation. The EIR is "intended to enable public agencies to evaluate a project to determine whether it may have a significant effect on the environment, to examine and institute methods of reducing adverse impacts, and to consider alternatives to the project as proposed." (Cal. Admin. Code, tit. 14, § 15012.) Public Resources Code, section 21100 sets forth the factors the EIR must consider, including adverse environmental effects, mitigation measures and alternatives to the "proposed action." Clearly those factors are meaningful only in the context of a particular contemplated land use. The requirement of consideration of mitigation measures and alternatives implies the power to condition or alter development plans in accordance with environmental goals; public agencies possess such power only when they directly engage in construction or perform the function of directly regulating private development.

The majority furnishes no substantial reason to reject the legislative declaration that the 1972 legislation is merely declarative of existing law—the *Friends of Mammoth* opinion describing project as referring to construction, acquisition, or development.

The majority fails to define the limits of CEQA; rather, it implies CEQA is applicable to *any* decision coming within the definition of "project" that may ultimately affect the environment. This is regretable because "project" is defined so broadly as to apply to any governmental determination, and there is an infinite variety of decisions constituting steps eventually resulting in the ultimate development or use of land. A decision to hire additional government employees may ultimately affect the use of land because the employees will need a place to work. Granting a permit to issue securities to a land development corporation to fund a subdivision or to a public utility to fund nuclear power plant construction may ultimately affect the environment. Adoption of licensing standards and issuance of driver's licenses may ultimately result in development of land because more highways may be necessary to handle increased traffic.

Rather than prepare EIRs for such hiring and licensing decisions, the report should be prepared for decisions authorizing use of land to build

office buildings, subdivisions, nuclear power plants and highways; the responsibility for such preparation should lie with the agencies authorizing or limiting such activities, not with agencies whose decisions might affect use of land but who have neither the responsibility nor the power to authorize or limit land development or use. I do not believe the Legislature intended that hiring agencies, the Corporations Commissioner and the Department of Motor Vehicles should prepare EIRs and hold hearings on environmental issues before acting; but under today's decision and *No Oil, Inc.* v. *City of Los Angeles*, 13 Cal.3d 68, 85 [118 Cal.Rptr. 34, 529 P.2d 66], requiring a report for agency action " 'arguably' " having an adverse environmental impact, it appears that such report will be required.[1]

The majority's failure to face the important question of the reach of CEQA is dramatically illustrated by the reasoning of the opinion. The majority states that "if the adoption of a general plan is a project, as the Guidelines provide, an annexation approval by a LAFCO becomes an a fortiori case." (*Ante,* p. 278.) This logic leap completely ignores the differing functions and powers of general plans and of LAFCO annexation approvals. Enactment and amendment of zoning ordinances and adoption of general plans are the very essence of land use regulation. These actions directly control the uses to which land will be put. In passing upon annexation proposals, LAFCO, as will be shown hereinafter, is powerless to regulate land use.

### THE KNOX-NESBIT ACT

The Knox-Nesbit Act (Gov. Code, § 54773 et seq.) was designed to curb the wasteful duplication of services resulting from indiscriminate formation of municipalities and special districts and from haphazard annexation of territory to existing local agencies. (*City of Ceres* v. *City of*

---

[1] I agree with the majority that the guidelines are confusing in some respects. However, most of the confusion is due to the majority's failure to recognize that the activities referred to in subdivisions (a) and (c) of section 21065 must be read as land use determinations. When we recognize that activities as used in the subdivisions are land use determinations, the convoluted reasoning and complex distinctions found in footnotes 16 and 19 of the majority opinion become unnecessary. The provision in 14 California Administrative Code, section 15037, subdivision (c), that " 'project' refers to the underlying activity and not to the governmental approval process" becomes evident. The reference to "underlying" is to make clear that we must look to what is authorized, not merely whether there is a step in the governmental approval process which will ultimately result in a development affecting the environment. The guideline makes clear that the determination requiring preparation of an EIR is the approval of the construction of the nuclear power plant, not the approval of the issuance of shares to fund it.

*Modesto* (1969) 274 Cal.App.2d 545, 553 [79 Cal.Rptr. 168].)[2] The purpose and responsibility of a LAFCO is "planning and shaping the logical and orderly development and coordination of local governmental agencies so as to advantageously provide for the present and future needs of the county and its communities . . . ." (Gov. Code, § 54774.) Stated differently, LAFCO constitutes "a single review entity to weigh alternative methods of providing local services, and to work out comprehensive strategies for the governmental structure of an entire area." (LeGates, Cal. Local Agency Formation Commissions, *supra,* p. 21.)

The function of LAFCO is to determine *which* local agency should exercise jurisdiction over a particular area consistent with orderly growth and capacity to extend needed services. While LAFCO may consider traditional environmental factors such as population density, land area and use, and topography, these are evaluated not with an eye toward the physical environmental impact of a proposed development but merely toward assessing which local entity should govern the area in light of existing and possible local agency service capabilities and "local conditions and circumstances." (Gov. Code, § 54774.) LAFCO's lack of power to control land development beyond fixing political boundaries is evident from Government Code section 54790, subdivision (a)(3), prohibiting LAFCO in annexation proceedings from imposing "any conditions which would directly regulate land use or subdivision requirements." Moreover, LAFCO is not in a position to regulate land development or use in approving or disapproving a proposed annexation. Annexation is frequently sought either at a time when ultimate use of the land has not been determined or at a time when the character of the area has become fixed by development. Even where changes in existing land use are contemplated and plans have been formulated, LAFCO has no say in the land's ultimate use, for plans may change after approval and there is no provision for further consideration by LAFCO.

### THE TWO STATUTES

Because CEQA applies only to land use determinations and because LAFCO, in considering annexation proposals, does not regulate land use

---

[2]The Knox-Nesbit Act was primarily a response to three undesirable conditions prevailing in California local government prior to its enactment. These were: (1) shortsighted municipal annexations, often motivated by a desire to bring within the city a high tax base area and resulting in odd and irrational municipal boundary configurations; (2) the proliferation of special districts to service unincorporated areas; and (3) municipal incorporations benefiting special interests or "defensively" initiated. (See LeGates, Cal. Local Agency Formation Commissions (1972) pp. 2-8; Note, *LAFCO: Is It In Control of Special Districts?* (1972) 23 Hastings L.J. 913, 914-921.)

but only determines which agency shall make land use determinations, it must be concluded that LAFCO annexation decisions are not subject to CEQA. Annexation approval does not constitute a "project" within the meaning of Public Resources Code, section 21065, subdivision (a) or subdivision (c). It is not an activity "directly undertaken" by a public agency, for LAFCO does not directly engage in construction or development. Neither is annexation approval an activity involving issuance by a public agency of an entitlement for use because LAFCO does not and cannot regulate private land use.

The conclusion is fortified when we consider that LAFCO annexation approval furnishes no assurance that the contemplated development will be accomplished. Similarly, LAFCO disapproval does not assure that the proposed development will not be accomplished. In view of the reality that much of California's urban area has been subdivided and developed in unincorporated areas under the regulation of county planning commissions and county boards of supervisors, there is no reason to believe that annexation approval—rather than disapproval—tends to further development.

Although before approving annexation LAFCO may require the city to prezone, LAFCO is prohibited from specifying the zoning or imposing conditions on annexation (Gov. Code, § 54790, subd. (a)), and should annexation be approved after prezoning, the city may later change zoning. On the other hand, disapproval of annexation leaves the county free to regulate land use as it sees fit. Without conducting psychological evaluations and compiling psychological profiles of city and county planning commission members, and of members of the city council and board of supervisors, LAFCO members are unable to determine whether approval or disapproval of annexation will further environmental quality. Such psychological studies hopefully will not be made, and an EIR without the studies would not provide LAFCO with any meaningful indication of the environmental effects of its approval or disapproval.[3]

The majority invoke the policy, enunciated in the guidelines, of encouraging preparation of an EIR "as early in the planning process as possible." (Cal. Admin. Code, tit. 14, § 15013.) But early preparation is not an end in itself, particularly when the insufficiency of data or plans

---

[3]At oral argument it was stated without dispute that the developer in the instant case first sought to develop under county regulation but the county refused to proceed until LAFCO determined whether development should be regulated by a municipality. Thereafter the developer went to the city, and the city requested annexation.

precludes drawing any meaningful conclusions in the report. The "planning process" should be viewed as the process of land use determination, when the reporting serves a mature and useful purpose.

CONCLUSION

CEQA requires preparation of an EIR only when a public agency directly engages in construction, acquisition or development, or regulates such activities of private parties. It does not apply to agency determinations which may ultimately affect land use but which neither authorize nor limit the use of land. In considering a proposed annexation, LAFCO determines only a political question, does not directly engage in development, and is prohibited from regulating private development activities. The majority has therefore improperly imposed on LAFCO a wasteful requirement.