Filed 7/17/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| ALBERT THOMAS PAULEK, | |
| Plaintiff and Appellant, | E059133 |
| v. | (Super.Ct.No. RIC1203353) |
| WESTERN RIVERSIDE COUNTY REGIONAL CONSERVATION AUTHORITY, | **ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING** |
| Defendant and Respondent; | [NO CHANGE IN JUDGMENT] |
| ANHEUSER-BUSCH, LLC, | |
| Real Party in Interest and Respondent. | |


The petitions for rehearing are denied. The opinion filed in this matter on June 17, 2015, is modified as follows:

1.       On page 28, in subsection 2, the middle of the second paragraph second paragraph starting "An agency is precluded" and to the end of the paragraph is deleted and the following is inserted in its place:

CEQA applies if there is substantial evidence a project may have a significant effect on the environment. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1098 (*Berkeley*).) Therefore, when determining whether a categorical exemption applies, the question is whether a fair argument has been made that the project will have a significant effect on the environment. (*Id.* at p. 1099.) In other words, if a fair argument has been made that the project *will* have a significant effect on the environment, then the project *may* have a significant effect on the environment, and therefore, the project is not one that falls into the per se categorical exemptions.

2.     On page 29, before the start of subsection 3 and as the final paragraph for subsection 2, the following paragraph is added:

An agency evaluates potential environmental effects under the fair argument standard, but judicial review "is limited to determining whether the agency applied the standard 'in [the] manner required by law,' " which means the court reviews the record to determine if the agency's fair argument conclusion is supported by substantial evidence. (*Berkeley*, *supra*, 60 Cal.4th at pp. 1115-1116.)

3.     On page 29, in the first paragraph, the second sentence that starts "Thus, the categorical exemption" and ends with "(*Banker's Hill*, *supra*, 139 Cal.App.4th at pp. 266-267" is deleted and the following sentence is inserted in its place:

2

Thus, the categorical exemption does *not* apply if there is a fair argument that the criteria refinement will have a significant effect on the environment—if there is a fair argument that the criteria refinement is not assuring the maintenance, restoration, or enhancement of a natural resource. (*Berkeley*, *supra*, 60 Cal.4th at pp. 1098-1099.)

4. On page 29, in the second paragraph, the sentence "We will again assume the Agency's view is correct in that the changes to the phase 9, Reynolds, and Peak properties should be viewed together" is deleted.

5. On page 30, before the paragraph that starts "The criteria refinement is a trade-off" the following paragraph is inserted:

There is evidence that the phase 9 property is not a "prime" habitat site for the lark and sparrow; however, there is nothing reflecting that the phase 9 property is superfluous to the species such that there could be substantial evidence to support the Agency's finding. In other words, the phase 9 property may not be "prime" or ideal, but that does not equate with environmentally "insignificant" or unneeded. In sum, the record lacks evidence to support the Agency's finding that the removal of the conservation overlay assures "the maintenance, restoration, or enhancement of a natural resource." (Cal. Code Regs., tit. 14, § 15307.)

6. On page 30, in the first paragraph, the third sentence that starts "There is evidence that the phase 9 property" to the end of the paragraph is deleted.

3

7. On page 30, before the start of subsection 4 "*CLASS 8 EXEMPTION*", the following two paragraphs are inserted:

Further, the Agency is responsible for carrying out the MSHCP's requirements. The goal of the MSHCP is to maintain biological diversity in open spaces. The Agency contracted to purchase the phase 9 property for $11,000,000. The reasonable inference to draw from this evidence is that the phase 9 property promotes biological diversity. The inference is drawn from the idea that an Agency designed to help maintain biological diversity would only spend $11,000,000 on land if it was environmentally significant.

Given the evidence that (1) there are species on the phase 9 property that are not on the Reynolds and Peak properties; (2) the Agency is spending $11,000,000 for the phase 9 property; and (3) the Agency is responsible for maintaining biological diversity in open spaces, there is substantial evidence the phase 9 property is environmentally significant. Combining the environmental significance of the phase 9 property with the removal of the conservation overlay, which would result in the phase 9 property no longer being protected for conservation purposes, the evidence supports a finding contrary to that made by the Agency—it supports a finding that there is a fair argument the project will have a significant effect on the environment. In sum, substantial evidence does

4

not support the Agency's application of the Class 7 exemption, but does support a contrary finding.

8.    Page 30, subsection 4, the second paragraph starting after "As explained, ante," is deleted and replaced by the following paragraph:

As explained, *ante*, there is evidence that the phase 9 property is not a "prime" habitat site for the lark and sparrow; however, there is nothing reflecting that the phase 9 property is superfluous to the species. As a result, there is a lack of substantial evidence supporting the Agency's finding regarding the Class 8 exemption.  In other words, the phase 9 property may not be "prime" or ideal, but that does not equate with environmentally "insignificant" or unneeded.  In sum, the record lacks evidence to support the Agency's finding that the removal of the conservation overlay assures the maintenance, restoration, enhancement, or protection of the environment.  (Cal. Code Regs., tit. 14, § 15308.)

9.    On page 31, the second complete paragraph, the second sentence the word "impact" is changed to "effect" so that the sentence reads:

This evidence shows an uncertainty about whether there will be a significant effect on the environment.

10.    On page 31, the second complete paragraph, the sentence that starts "Given the evidence" to the end of the paragraph is deleted and replaced with the following:

There is also the evidence discussed *ante*, concerning the Agency—which is tasked with maintaining biological diversity—paying $11,000,000 for the phase 9 property. In sum, there is not substantial evidence supporting the Agency's application of the Class 8 exemption, but there is evidence supporting a contrary finding. Since there is not substantial evidence, the categorical Class 8 exemption does not apply.

11. On page 32, before the start of subsection 5, the following paragraph is added:

> In performing our substantial evidence analysis, we have considered both (1) if there is evidence supporting a finding that the project helps to maintain, restore, or protect the environment; and (2) if there is evidence supporting the finding that there is not a fair argument to be made that the project will have a significant effect on the environment. So we have looked for both evidence of positive effects (restoration, protection) and a lack of negative effects. As explained *ante*, substantial evidence does not support the Agency's finding.

12. On page 32, the second full paragraph, the second sentence starting "The Agency's argument fails" to the end of the paragraph is deleted and replaced with the following:

> The Agency's argument fails to explain how it is known that there will not be a significant effect to the environment or a natural resource. Pointing out that the two alternate properties may be of equal or greater

6

environmental significance does not support a finding that the loss of environmental protection on the phase 9 property will not have a significant effect on the environment; loss of protection on an equally significant piece of property would have an effect on the environment.

13.     On page 35, in the bottom partial paragraph, the word "will" is replaced with the word "may," so the sentence reads as follows:

Logically, if it is too early to determine the project may have a significant negative impact on the environment, then it would also be too early to determine the project may benefit the environment.

14.     On page 41, in the first complete paragraph, the last sentence "As a result, we conclude substantial evidence does not support application of the common sense exemption" is deleted.

15.     On page 41, at the end of the second complete paragraph, which starts "The agency contends the common sense exemption is applicable" the following footnote, designated footnote No. 4, is added after the parenthetical citations to *Black* and *Muzzy*:

Prior to oral argument at this court, the Agency notified this court of the *Berkeley* opinion being filed.  The Agency cited *Berkeley* during oral argument at this court.  *Berkeley* concerns the usual circumstances exception.  (*Berkeley*, *supra*, 60 Cal.4th at p. 1097.)  Under the unusual circumstances exception, a project that was found to be exempt from CEQA can be brought back under CEQA if " 'there is a reasonable

7

possibility that the activity will have a significant effect on the environment due to unusual circumstances.' " (*Id*. at p. 1097.) Thus, the unusual circumstances exception is triggered by projects that have been found to be exempt. This court concluded the Class 7, Class 8, and Common Sense exemptions do not apply. As a result, we do not have occasion to discuss the unusual circumstances exception, and do not delve further into *Berkeley*.

Except for these modifications, the opinion remains unchanged. The modifications do not affect a change in the judgment.

CERTIFIED FOR PUBLICATION

MILLER
J.

We concur:

McKINSTER
Acting P. J.

KING
J.

Filed 6/17/15 (unmodified version)

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


|  |  |
|---|---|
| ALBERT THOMAS PAULEK, | |
| Plaintiff and Appellant, | E059133 |
| v. | (Super.Ct.No. RIC1203353) |
| WESTERN RIVERSIDE COUNTY REGIONAL CONSERVATION AUTHORITY, | OPINION |
| Defendant and Respondent; | |
| ANHEUSER-BUSCH, LLC, | |
| Real Party in Interest and Respondent. | |


        APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia,

Judge.  Reversed.

        Susan Nash for Plaintiff and Appellant.


1

Best Best & Krieger, Michelle Ouellette, Charity Schiller and Lucas I. Quass for Defendant and Respondent Western Riverside County Regional Conservation Authority.

Allen Matkins Leck Gamble Mallory & Natsis, K. Erik Friess and Nicholas S. Shantar for Real Party in Interest and Respondent Anheuser-Busch, LLC.

Plaintiff and appellant Albert Thomas Paulek petitioned the trial court for a writ of mandate. In the petition, Paulek alleged defendant and respondent Western Riverside County Regional Conservation Authority (the Agency) erred by concluding (1) a particular activity is not a project under the California Environmental Quality Act (CEQA); and (2) that, if it were a project, then it was exempt from CEQA. The activity at issue involved removing a conservation designation from one parcel of land, and placing the designation on two other parcels of land. The trial court found Paulek had standing and the moving of the conservation designation qualified as a "project" under CEQA. The trial court denied the writ petition because it found the project fell within a CEQA exemption. Paulek contends (1) he has standing; (2) the moving of the restrictions is a CEQA project; and (3) the project does not fall within the identified CEQA exemptions. We reverse the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A.      MULTIPLE SPECIES HABITAT CONSERVATION PLAN

The Multiple Species Habitat Conservation Plan (MSHCP) is a plan to maintain open spaces in the western portion of Riverside County (the County). The goal of the MSHCP is to maintain biological diversity in open space areas, while allowing future

2

economic growth. The MSHCP caused conservation areas to be created in the western portion of the County. The conservation areas totalled 500,000 acres of land. The 500,000 acres included 347,000 acres of existing public or quasi-public lands and approximately 153,000 acres of "Additional Reserve Land."

The 153,000 acres needed to be acquired at the time the MSHCP was created in 2003. The exact locations of the 153,000 acres were not identified in the MSHCP. Instead, the MSHCP identified a "criteria area" that was "significantly larger" than 153,000 acres; the criteria area was approximately 340,000 acres. The criteria area was broken into cells. Each cell was approximately 160 acres in size. The cells were to be evaluated to determine what portions of the criteria area to include in the conservation area.

The MSHCP provided "criteria" about the different cells. The "criteria" included information about (1) the features of the land in the cell; (2) the particular species that could be conserved on the land in the cell; (3) how the land in the cell was configured; and (4) the geographic location of the cell.

The MSHCP accounted for the possibility that the criteria information for the cells could change. Examples of possible changes included: (1) new biological information could be discovered, (2) updated land use information could be obtained, e.g. development information, and (3) new topographic or engineering information could be discovered. Changing the criteria information in the MSHCP required a procedure known as the "Criteria Refinement Process." The Criteria Refinement

Process required written notification, inclusion on the Agency's agenda, and a 60-day review and response period.

If, as a result of the criteria changing, the land (cell) would no longer be part of the criteria area, then (1) the MSHCP must be amended, or (2) other property must be acquired to replace the land that would be lost. The replacement land must be biologically equivalent or superior to the land that was being lost. The equivalent or superior land determination was made through a process known as an "equivalency analysis." If the result of the equivalency analysis was that the replacement land was biologically equivalent or superior then that change was an "acceptable refinement[] to the MSHCP." If the replacement land was found to not be biologically equivalent or superior, then that would be an "unacceptable deviation[] from the MSHCP Criteria and an amendment to the MSHCP would be required prior to approval." The Agency was responsible for carrying out the MSHCP's requirements. The Agency was a joint powers authority. (Gov. Code, §§ 6500-6536.)

B.    EMINENT DOMAIN CASE

Real party in interest and respondent Anheuser-Bush, LLC (Anheuser) owned a 964.21-acre parcel known as the Warm Springs Ranch (the Ranch). The Ranch was located in an unincorporated area of the County, immediately northeast of the City of Murrieta. The Ranch was "largely surrounded by existing or approved [suburban] development." The Ranch was part of the MSHCP criteria area. There were six MSHCP "cells" on the Ranch.

4

In 2002, the County informed Anheuser that development would be prohibited on the Ranch because the Ranch would be part of the conservation area. In other words, a conservation overlay had been placed upon the Ranch. The MSHCP was approved in June 2003. In October 2003, the County changed the zoning for the Ranch from " 'Rural' and 'Future Urban' " to " 'Rural Residential.' " This meant the development possibilities changed from (a) 2.5 to 3.0 dwelling units for every acre to (b) one dwelling unit for every five acres.

In order to develop land within the MSHCP criteria area, i.e., land subject to a conservation overlay, the property owner must go through the Habitat Evaluation and Acquisition Negotiation Strategy (HANS) process. Under the HANS process, to develop the Ranch property, Anheuser would need to submit an application for the proposed development project. An initial review would examine whether all or part of the property was needed for the MSHCP conservation area. If the initial review reflected all or part of the property was needed for the conservation area, then the parties begin negotiating for conveyance of all or part of the property.[1] If it is determined that the property is not needed for the conservation area, "then the proposed project may proceed through the normal project planning and design process."

In December 2005, Anheuser submitted applications to develop the Ranch. Anheuser submitted a general plan amendment, an application for a zoning change, and

_____

[1] We take judicial notice of the first 10 pages of section 6 of the MSHCP, because the record on appeal includes only pieces of the section. (Evid. Code, § 452, subd. (c); *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 972, fn. 6 [taking judicial notice of a regional board's minutes].)

a specific plan for the Ranch, which contemplated residential development. In February 2007, presumably after conducting the HANS process, the County informed Anheuser that all but 71 acres of the Ranch would be acquired for conservation under the MSHCP.

The County, the Agency, and Anheuser negotiated. They discussed the possibility of a "land swap." In the land swap, the County/Agency would (1) acquire a portion of the Ranch, (2) provide "MSHCP clearance" for the remainder of the Ranch that Anheuser continued to own, and (3) convey other County land to Anheuser for Anheuser to develop. "[T]hird parties" objected to the land swap and the County and Agency "walked away" from the land swap negotiations.

In 2009, the County sued Anheuser in eminent domain. The County sought to take a portion of the Ranch in order to widen and extend Clinton Keith Road. Anheuser filed a cross-complaint for inverse condemnation. The Agency was not named as a party in the complaint or cross-complaint.

In 2011, Anheuser and the County reached a settlement. The Agency was also a party to the "Settlement Agreement." It appears the Agency became involved because Anheuser alleged the application of the MSHCP criteria constituted a taking. In the Settlement Agreement, Anheuser, the County, and the Agency agreed (1) to dismiss their lawsuits, and (2) the Agency would purchase the Ranch from Anheuser. The Agency and Anheuser, but not the County, executed a separate "Purchase and Sale Agreement" regarding the Agency's purchase of the Ranch.

The Purchase and Sale Agreement reflected the Agency planned to purchase the Ranch in nine different phases. For example, phase 1 consisted of 250.18 acres and would cost $10,000,000, while phase 2 consisted of 73.41 acres and would cost $3,000,000. The different phases would be purchased over a period of eight years. The phases were scheduled to be purchased each year, in succession. So, phase 1 would be purchased immediately, in January 2012; then the phase 2 purchase would be completed by the first anniversary of the phase 1 purchase, in January 2013; the phase 3 purchase would be completed by the second anniversary of the phase 1 purchase, in January 2014; and so forth. The phase 9 purchase would be the final purchase, by the eighth anniversary of the phase 1 purchase, in January 2020. The phase 9 property is a 200-acre area and will cost $11,000,000.

The phase 9 property had conditions as part of the Purchase and Sale Agreement: The Agency was to use its best efforts to complete a "criteria refinement" process for the phase 9 property before March 2012, which would eliminate the cells on the phase 9 property, cause it to no longer be described as conservation land, and would relieve the land from being subject to the HANS process. The Agency also agreed to make the phase 9 property a separate legal parcel.

In order to remove the MSHCP conservation overlay from the phase 9 property, the Agency had to (1) amend the MSHCP, or (2) refine the MSHCP by replacing the lost land with biologically equivalent or superior replacement land. The removal of the MSHCP conservation overlay would permit development to possibly occur in the future on the 200-acre phase 9 site, if the Agency failed to make the $11,000,000 purchase.

7

The Agency explained that, if it failed to make the purchase, then the phase 9 property would likely be developed into a university or used for residential and retail purposes.

Since the MSHCP conservation overlay would be removed from the phase 9 property, the Agency considered replacing the 200-acre phase 9 site with two sites that aggregated to 1,064 acres. The first site was the Reynolds property, which consisted of 606 acres (Reynolds property). The second site was the Winchester-Tule Peak property, which totaled 458 acres (Peak property). In conducting the equivalency analysis, biologists found portions of the Ranch burned in a 2011 wildfire, the Ranch had manure spread on it, many of the plants on the Ranch were not native species, and people trespassed on the Ranch with dirt bikes. However, biologists also found (1) there were species on the phase 9 property, such as the California Horned Lark and the Southern California Rufous-crowned Sparrow, that were not present on the two proposed replacement properties; and (2) future development on the phase 9 property could disturb a neighboring conservation area.

In regard to the Reynolds property, biologists found it was primarily Coastal Sage Scrub. The Peak property was predominately Chaparral. The Reynolds and Peak properties were better for species such as the Gnatcatcher and Quino Checkerspot Butterfly, than the phase 9 property.

On February 6, 2012, the Agency held a public hearing to consider the criteria refinement, i.e., whether the MSHCP conservation overlay should be removed from the phase 9 property and placed upon the Reynolds and Peak properties. Paulek spoke at the meeting. Paulek asserted the Agency erred by proposing to exempt the MSHCP

conservation overlay swap from CEQA review. Paulek contended that by removing the MSHCP conservation overlay, the Agency was creating the possibility that the site could be developed into a university or residential and retail area, which would adversely impact the neighboring conservation area. Paulek requested the Agency consider how removal of the MSHCP conservation overlay would impact the environment when combined with the potential for future development on the phase 9 site and the extension of Clinton Keith Road.

Paulek's attorney also spoke at the meeting. Paulek's attorney questioned why the Agency would be purchasing land and removing the conservation overlay, since the Agency was created to conserve land. Paulek's attorney also questioned whether the change in the conservation overlay related to litigation with Anheuser because it was unclear from reading the Agency's report whether litigation was somehow involved.

The Agency's attorney said the phase 9 purchase and removal of the conservation overlay were related to a settlement with Anheuser. An employee of the company that created the Agency's criteria refinement report explained the phase 9 property "could be conserved or developed." An Agency board member asked, "Where's the analysis that shows that we have a high probability that we will have the money to buy [the phase 9 property]?" The Agency's attorney responded that the criteria refinement had to be completed as part of the settlement with Anheuser.

On February 6, 2012, the Agency passed a resolution refining the criteria for the phase 9 property, i.e., removing the conservation overlay. The resolution was Resolution 12-002. The resolution reflected the criteria refinement (1) was not a project

9

(Cal. Code Regs., tit. 14, § 15378); (2) was a project, but was exempt because it assured the maintenance or enhancement of a natural resource (Class 7 exemption) (Cal. Code Regs., tit. 14, § 15307); and (3) was a project, but was exempt because it assured the maintenance or enhancement of the environment (Class 8 exemption) (Cal. Code Regs., tit. 14, § 15308).

Paulek filed a petition for writ of mandate and complaint for injunctive relief against the Agency, with Anheuser listed as the real party in interest. Paulek requested (1) a writ of mandate directing the Agency to vacate and set aside its approval of the criteria refinement; (2) alternative and peremptory writs of mandate directing the Agency to comply with CEQA; and (3) a stay and injunction preventing the Agency and Anheuser from implementing the criteria refinement until CEQA requirements had been met. Paulek asserted the criteria refinement, i.e., removal of the conservation overlay, was a "project" within the meaning of CEQA and that the project did not fall within the Class 7 and Class 8 CEQA exemptions that were identified in the Agency's resolution.

The Agency demurred to Paulek's petition and complaint. Anheuser joined in the demurrer. In the demurrer, the Agency asserted (1) Paulek lacked standing, and (2) Paulek failed to join a necessary and indispensible party. In order for a person to have standing in a CEQA lawsuit, the person must first have objected to the project prior to the public hearing period closing. (Pub. Res. Code, § 21177, subd. (a).)[2]

---

   [2] All subsequent statutory references will be to the Public Resources Code unless otherwise indicated.

In the demurrer, the Agency asserted Paulek's lawsuit was brought in his individual capacity, while his comments during the public hearing period were brought in his capacity as the conservation chair for the Friends of the Northern San Jacinto Valley (the Friends). The Agency asserted Paulek's attorney's comments during the public comment period were also brought on behalf of the Friends. The Agency argued Paulek lacked standing to bring the lawsuit in his individual capacity because, during the public comment period, he did not object as an individual.

The Agency also asserted Paulek's lawsuit was deficient because he failed to include the County as a defendant. The Agency asserted the County was a necessary and indispensible party because vacating the approval of the criteria refinement would affect the County's Settlement Agreement with Anheuser. The Agency asserted the standing and joinder issues could not be remedied because the statute of limitations for amending the complaint and petition had passed. Therefore, the Agency contended the demurrer must be sustained.

Paulek opposed the demurrer. Paulek asserted there was no legal authority for the proposition that he ceased to be an individual due to his membership in an organization for purposes of standing under section 21177. Paulek contended the County was not a necessary or indispensible party because the County was not a signatory to the Purchase and Sale Agreement in which the Agency agreed to purchase the phase 9 property and remove the MSHCP restrictions. Paulek argued there was nothing indicating the Settlement Agreement would be affected by temporarily halting

11

implementation of the criteria refinement during a CEQA compliance period. The trial court overruled the demurrer.

The Agency and Anheuser filed answers to Paulek's petition and complaint. Paulek filed an opening brief in the trial court. First, Paulek contended the Agency erred by combining two procedural steps. Paulek explained that the Agency was required to determine if the removal of MSHCP restrictions would impact the environment, and then, if it did *not* have an impact, a CEQA exemption would apply, but it if *did* have an impact, mitigation measures must be considered. Paulek asserted the Agency erred by combining these steps. Paulek asserted the Agency incorrectly determined the removal of MSHCP conservation overlay would not have impact on the environment due to the mitigation measures. In other words, Paulek asserted the Agency should have considered whether removing the MSHCP conservation overlay from the phase 9 property would have an environmental impact, without consideration to any mitigation involving the Reynolds and Peak properties.

Second, Paulek contended possible development on the phase 9 property had the potential to affect wildlife by reducing habitat. Paulek explained there were endangered, rare, and threatened species on the phase 9 property and future development of the site could impact those species.

The Agency filed points and authorities in opposition to Paulek's opening brief. First, the Agency asserted Paulek's petition was time barred because Paulek was challenging the Settlement Agreement from the Anheuser lawsuit, and the time to challenge the Settlement Agreement passed. Second, the Agency asserted Paulek's

petition failed because he did not join a necessary and indispensible party—the County. The Agency asserted the County was a necessary and indispensible party because Paulek was challenging the Settlement Agreement. Third, the Agency asserted Paulek lacked standing because, during the public comment period, Paulek did not object in his capacity as an individual.

The Agency asserted the February 2012 criteria refinement "was merely [the Agency's] implementation of *one of the terms* of the Settlement Agreement." In connection with this argument, the Agency faulted Paulek's assertion that the Agency had authorized development of the phase 9 property. The Agency asserted the criteria refinement did not approve development of the phase 9 property.

Fourth, the Agency asserted it did not combine procedural steps when analyzing the potential for an environmental impact. The Agency explained that the Criteria Refinement Process requires an exchange of land, so the moving of the MSHCP conservation overlay from the phase 9 property to the Reynolds and Peak properties was not mitigation; rather, it was the project. The Agency asserted that if the land exchange were deemed mitigation, then it was unclear what the "project" would be.

Fifth, the Agency asserted criteria refinement was not a project under CEQA. The Agency contended the purpose of the criteria refinement was to protect 1,064 acres of land. Since 1,064 acres would be protected as open space, CEQA does not apply. The Agency asserted the phase 9 property was "highly disturbed and represents [a] degraded habitat." Therefore, the Agency reasoned, the action would result in more and better land being protected, so the action was not a CEQA "project."

13

Anheuser also filed an opposition. Anheuser joined in the Agency's arguments. Anheuser also asserted Paulek's petition was untimely because Paulek was challenging the Settlement Agreement, and the time to challenge that agreement had passed prior to Paulek filing his petition and complaint. Anheuser also asserted Paulek's petition and complaint failed because he did not join a necessary and indispensible party, i.e., the County.

Paulek filed a reply. First, Paulek asserted the County was not a necessary and indispensible party because the Settlement Agreement was not the subject of Paulek's litigation. Paulek asserted the subject of the litigation was the criteria refinement, i.e., the Agency's resolution and CEQA "Notice of Exemption," neither of which was issued by the County. Paulek also noted that, as part of the demurrer, the trial court already found the County was not a necessary or indispensible party.

Second, Paulek contended he had standing to sue. Paulek noted the standing issue had already been decided as part of the demurrer. Paulek asserted he had standing because there was no legal authority for the theory that Paulek's act of mentioning his membership in the Friends stripped him of his status as an individual when commenting on the criteria refinement.

Third, Paulek asserted the Agency made procedural errors. Paulek contended the Agency erred by finding the criteria refinement was not a project under CEQA, and then finding the activities were a project under CEQA, but that the project was exempt for two different reasons. Paulek asserted the law required the Agency to select one reason, rather than three reasons, why CEQA did not apply.

14

Fourth, Paulek asserted the evidence reflected development on the phase 9 property could affect the conservation area to the north of the phase 9 property because development would create "a new urban edge." Paulek contended the criteria refinement could potentially have significant impacts on the environment and would need to be reviewed through a mitigated negative declaration or an environmental impact report.

The trial court issued a written ruling in the matter. First, the trial court found Paulek did not fail to join an indispensible party because the County did not participate in the February 6th public hearing and therefore could not be a "recipient of an approval" that must be named as a party. (Former § 21167.6.5, subd. (a) [effective 2005].) Second, the trial court found Paulek had standing. The trial court explained it was irrelevant whether Paulek spoke on his personal behalf or on behalf of the Friends at the February 6th meeting because either way, Paulek spoke at the meeting.

Third, the trial court found Paulek's petition was not time-barred. The trial court found the project at issue was the February 6th criteria refinement, i.e., the Agency's resolution, as opposed to the earlier Settlement Agreement. Therefore, the petition was not time-barred. The trial court explained that removing the MSHCP conservation overlay from the phase 9 property "allows at least the potential for future development, since the only thing that prevented any type of development on this land was the MSHCP criteria." The court found that removing the MSHCP conservation overlay "amounts to 'a reasonably foreseeable indirect physical change in the environment' on

15

those 200 acres of land." Therefore, the trial court concluded the criteria refinement on the phase 9 property constituted a CEQA project.

The trial court then considered CEQA exemptions, in particular the Class 7 and Class 8 exemptions identified in the Agency's resolution. The Class 7 exemption exempts CEQA projects that "consist[] of actions taken by regulatory agencies . . . to assure the maintenance, restoration, or enhancement of *a natural resource* where the regulatory process involves procedures for protection of the environment. Examples include but are not limited to wildlife preservation activities of the State Department of Fish and Game. Construction activities are not included in this exemption." (Cal. Code Regs., tit. 14, § 15307, italics added.)

The Class 8 exemption exempts CEQA projects that "consist[] of actions taken by regulatory agencies . . . to assure the maintenance, restoration, enhancement, or protection of *the environment* where the regulatory process involves procedures for protection of the environment. Construction activities and relaxation of standards allowing environmental degradation are not included in this exemption." (Cal. Code Regs., tit. 14, § 15308, italics added.)

Class 7 exempts projects that maintain or protect "a natural resource," while Class 8 exempts projects that maintain or protect "the environment."

The trial court found construction would not take place on the phase 9 property, and that it appeared the property would be preserved. The trial court explained that the MSHCP conservation overlay was only removed from the phase 9 property so that if the

16

Agency failed to purchase it, then the land would be "useful" to Anheuser. Thus, the trial court found the Class 7 exemption applied in this case, i.e., CEQA did not apply.

The trial court then turned to whether an exception to the Class 7 exemption applied, such that CEQA would apply to the project. The exception at issue provides an exemption shall not be applied to "an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).) The trial court found the circumstances were not unusual because (1) there were few protected species on the phase 9 property; and (2) the Agency has the authority to remove the MSHCP conservation overlay from properties.

Next, the trial court considered whether CEQA applied because the project may have a significant effect on the environment based upon the project having "the potential to . . . threaten to eliminate a plant or animal community; [or] substantially reduce the number or restrict the range of an endangered, rare or threatened species." (Cal. Code Regs., tit. 14, § 15065, subd. (a)(1).) The court found there was nothing indicating a species would be harmed. The trial court denied Paulek's petition and entered judgment in favor of the Agency and Anheuser.

## DISCUSSION

Paulek contends the trial court erred by denying his petition and entering judgment in favor of the Agency and Anheuser.

17

A.     STANDING

Paulek asserts he has standing.  During the public comment period, when Paulek spoke, he introduced himself and identified himself as the conservation chair for the Friends.  Paulek also submitted a letter, on plain paper, without letterhead, wherein the signature block reflected Paulek was the Friends's conservation chair.  So the question presented is whether Paulek lost his standing as an individual by identifying himself as the Friends's conservation chair.

Since the facts are undisputed, we review the issue do novo.  (*Scott v. Thompson* (2010) 184 Cal.App.4th 1506, 1510.)  The "standing" provision for CEQA concerns administrative exhaustion.  In order to have a standing to sue, a person must first have exhausted his administrative remedies by raising his objections either orally or in writing during the government agency's public comment period.  (§ 21177, subd. (a).)

Paulek has standing because he spoke at the public hearing and submitted a letter.  At the February 6th meeting, Paulek said, "I have two issues of, well, my name is Tom Paulek.  Uh I'm the conservation chair for the Friends[.]  Long time resident of uh Riverside County."  Paulek's comments can be interpreted as him speaking in both capacities—on his personal behalf, since he identified his personal residence status, and in his capacity as an officer of the Friends, since he also identified himself in that capacity.  Given that Paulek identified himself in both capacities, and it would strain government resources for people to have to repeat identical comments in different capacities, we conclude Paulek has standing.

18

The Agency asserts Paulek only objected on behalf of the Friends. Therefore, the Friends would have standing but Paulek does not. Organizations or associations gain standing to sue when their members have standing to bring the case as individuals. (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School District* (2013) 215 Cal.App.4th 1013, 1031; *Monterey/Santa Cruz County Bldg. and Const. Trades Counsel v. Cypress Marina Heights LP* (2011) 191 Cal.App.4th 1500, 1521.) Since Paulek spoke at the meeting someone has standing. If we concluded that "someone" is only the Friends, but not Paulek, then we would be upending the rule that organizations gain standing through their members. We cannot conclude the organization has standing but the person who created the organization's standing lacks individual standing. Paulek speaking at the meeting exhausted the administrative remedies for himself and the Friends, any other conclusion would contradict settled law reflecting organizations gain standing through their members' individual standing.

## B. STANDARD OF REVIEW

"In reviewing an agency's decision for CEQA compliance, an appellate court applies the same standard applied by the trial court, whose findings are not binding on appeal. [Citation.] We independently review the administrative record to determine whether the agency prejudicially abused its discretion. [Citations.] An agency abuses its discretion if it fails to proceed in a manner as required by law or if substantial evidence in the record does not support the agency's decision. [Citations.]" (*Citizens for Responsible and Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1330-1331 [Fourth Dist., Div. Two].)

19

C.    PROJECT

1.    *ISSUE*

Paulek contends the criteria refinement is a project under CEQA.

2.    *ESCROW*

At the outset, we address the status of the phase 9 property. On December 28, 2011, the Agency and Anheuser entered into a Purchase and Sale Agreement, wherein the Agency agreed to purchase Anheuser's Ranch property in nine phases. The Purchase and Sale Agreement included prices, timelines, and escrow instructions.

The $11,000,000 purchase of the phase 9 property was scheduled to occur by January 2020. As part of the Purchase and Sale Agreement, Anheuser agreed not to materially change or alter the Ranch until escrow closed on the phase 9 property or until the Purchase and Sale Agreement terminated. The Purchase and Sale Agreement can terminate if the Agency does not purchase one of the phases as required. Anheuser agreed to deliver the relevant deeds to the escrow holder five days prior to each close of escrow. The Agency agreed to provide funds to the escrow holder at least one day prior to each close of escrow.

Given the Purchase and Sale Agreement, the phase 9 property is essentially being held in escrow until January 2020. (See *Markowitz v. Fidelity Nat. Title Co.* (2006) 142 Cal.App.4th 508, 526 [defining escrow].) Right now, the phase 9 property could be purchased by the Agency, in which case the property may be preserved and the MSHCP restrictions may be reinstated. It could also not be purchased by the Agency, in which case Anheuser or another owner could develop the property. The point being, at the

20

moment, we do not know what the result of this escrow situation will be—conservation or development are equally possible. However, we do know what has occurred in the past, which is that the MSHCP conservation overlay was removed from the phase 9 property, and the impetus was the settling of a lawsuit.

### 3. *CEQA STRUCTURE*

"CEQA has a three-tiered structure. [Citations.] First, if a project falls into an exempt category, or ' "it can be seen with certainty that the activity in question will not have a significant effect on the environment, [citation] no further agency evaluation is required." ' [Citation.] Second, if there is a possibility the project will have a significant effect on the environment, the agency must undertake an initial threshold study; if that study indicates that the project will not have a significant effect, the agency may issue a negative declaration. Finally, if the project will have a significant effect on the environment, an Environmental Impact Report (EIR) is required. [Citation.]" (*Committee to Save Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1185-1186.)

### 4. *ANALYSIS*

Paulek asserts the criteria refinement is a project under CEQA. This relates to the first step of the CEQA process. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 (*Muzzy*).) The Agency found both that the criteria refinement (1) is not a project (Cal. Code Regs., tit. 14, § 15378), and (2) is a project, but is exempt from CEQA (Cal. Code Regs., tit. 14, § 15307-15308).

21

" 'Whether a particular activity constitutes a project in the first instance is a question of law.' [Citation.]" (*Creed-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 503; see also *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 702-702 [whether an activity is a project is a "matter of law"].) Accordingly, we apply the de novo standard of review. (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1503.)

An agency must conduct a preliminary review to determine whether an activity is a "project" and therefore subject to CEQA. If an activity is not a project, then it is not subject to CEQA. (*Muzzy*, *supra*, 41 Cal.4th at p. 380.) " 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency." (§ 21065; Cal. Code Regs., tit. 14, § 15378.)

The amendment of a city's or county's general plan is considered a "project" under CEQA because such plans "embody fundamental land use decisions that guide future growth and development of cities and counties, [and therefore] they have the potential for [causing] ultimate physical changes in the environment." (*Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 985 (*Black*), citing *City of Santa Ana v. City of Garden Grove* (1979) 100 Cal.App.3d 521, 534.) Therefore, when a city or county is considering an amendment to a general plan, it must assess the impact of the amendment by examining "the potential impact of the amendment on the existing physical environment; a comparison between the proposed amendment and the

existing general plan is insufficient." (*Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 186-187.) Similarly, section 21080, subdivision (a), describes "the enactment and amendment of zoning ordinances" as a "project."

The MSHCP is designed for "Riverside County . . . and its Cities to better control local land use decisions" and is "one element of a comprehensive regional planning effort." The MSHCP "forms the nucleus of an open-space plan for the western part of the County." When the MSHCP criteria are applied to a parcel of land, in order to develop the land, one must go through the HANS process. If it is determined that the land proposed to be developed is needed for the MSHCP conservation area, then the Agency and land owner negotiate for the land to be conveyed to the Agency, and, hence, the land is not developed.

The purpose of the negotiations is to "focus on establishing a purchase price and other incentives that may be available to assist with the acquisition and compensate the property owner." If the negotiations fail, then a conflict resolution process is instituted. In the conflict resolution process, a neutral third party mediates the dispute. If there is still a dispute following the mediation, then the property owner may (1) request the board of supervisors or relevant city council review the dispute, or (2) initiate arbitration.

In the instant case, after Anheuser submitted plans to develop the Ranch, the Agency informed Anheuser that all but 71 acres would be acquired for conservation. Thus, the Ranch property, with the exception of 71 acres, would be conservation property. However, if the MSHCP conservation overlay is removed, then the phase 9

property is no longer protected land subject to the HANS process and development controls—any future development could "proceed through the normal project planning and design process."

Given that the MSHCP is designed to help the County and cities "control local land use decisions," and that removing the MSHCP conservation overlay will change the phase 9 property from protected property to unprotected property, removing the MSHCP conservation overlay is analogous to amending a general plan or changing a zoning ordinance.  (See *W.W. Dean & Associates v. City of South San Francisco* (1987) 190 Cal.App.3d 1368, 1379 [amending a general plan includes changing land use from "open space to developable"].)

The "thrust of CEQA . . . requires governmental agencies 'at all levels' to consider environmental factors.  Obviously it is desirable that the precise information concerning environmental consequences which an [environmental impact report or mitigated negative declaration] affords be furnished and considered at the earliest possible stage.  The [CEQA] Guidelines express this principle in a variety of ways.  Thus, '[environmental impact reports] should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design.'  [Citation.]"  (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 282 (*Bozung*); see also *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 129.)

Thus, even though the removal of conservation overlay is akin to a land-use matter, rather than a construction matter, the action can still be a "project."  CEQA

24

encourages environmental factors to be considered "at all levels"—from land use planning to construction planning. Considering environmental factors at the land use stage allows possible environmental impacts to be assessed " 'as early as possible in governmental planning.' [Citation.]" (*Bozung*, *supra*, 13 Cal.3d at p. 282, italics omitted.)

As a result, we conclude the removal of the conservation overlay from the phase 9 property is a "project" under CEQA as the change embodied a fundamental land use decision that has the potential for causing ultimate physical changes in the environment, because land that was protected for conservation purposes will no longer be subject to such protections. (See *Black*, *supra*, 22 Cal.App.4th at p. 985.)

The Agency contends the criteria refinement is not a "project" because it will result in 1,064 acres of open space being preserved. The Agency is conflating the removal of the MSHCP conservation overlay with the MSHCP's mitigation option. Under the MSHCP, when criteria are removed from a parcel of land there are two options (1) amend the MSHCP, or (2) substitute other land that is of equal or superior biological quality. Thus, the "project" is the removal of the MSHCP conservation overlay, and there are two different options for how to handle that project within the MSHCP—either amend the MSHCP or substitute other land. The decision to remove the MSHCP conservation overlay is separate from the decision to substitute other land. The Agency is incorrectly combining them into a single act; they are separate acts: First, the Agency elected to remove the MSHCP conservation overlay from the phase 9

property. Second, the Agency elected to mitigate the removal of the conservation overlay by substituting land rather than amending the MSHCP.

Nevertheless, for the sake of addressing the Agency's argument, we will assume the decision to add the MSHCP conservation overlay to the Reynolds and Peak properties is part of the same act as removing the conservation overlay from the phase 9 property. The fact remains that the 200 acres of the phase 9 property will no longer be protected by the conservation overlay. The decision, even when it is all combined, embodies a fundamental land use decision that has the potential for causing ultimate physical changes in the environment because land that was protected by the overlay is no longer protected. (See *Black*, *supra*, 22 Cal.App.4th at p. 985.)

The Agency asserts the criteria refinement is not a project because the Reynolds and Peak properties are biologically superior or equivalent to the phase 9 property. The Agency's argument is not persuasive because it does not take into account the changes to the phase 9 property; it only takes into account the changes on the Reynolds and Peak properties. The Agency fails to explain how the criteria refinement does not have the potential for causing ultimate physical changes in the environment of the phase 9 property. The Agency's argument is essentially washing over any negative changes to the phase 9 property by highlighting the positive changes to the Reynolds and Peak properties; this failure to address the alterations to the phase 9 property causes the Agency's argument to be unpersuasive.

The Agency asserts the criteria refinement is not a project because the Agency "fully intends to conserve the phase 9 Property." The Agency's argument is

26

unpersuasive because the Agency is not the owner of the phase 9 property. The Agency has an agreement to purchase the phase 9 property in 2020, but until that purchase occurs, all we know for certain is that Anheuser owns the phase 9 property. The Agency may ultimately purchase the phase 9 property, and may reinstate the MSHCP conservation overlay on the phase 9 property, but for now, that is speculation. As a result, we cannot treat the phase 9 property as land that will be preserved.

The Agency contends the criteria refinement is not a project because Paulek is speculating about the phase 9 property being developed. The Agency asserts that since there are no development plans, there will not be environmental impacts. As explained, *ante*, it is uncertain whether the phase 9 property will be developed or preserved in the future. So, this is a situation in which all that can be known with certainty is that the MSHCP conservation overlay was removed from the phase 9 property. Therefore, the change is analogous to amending a general plan or changing a zoning ordinance. The phase 9 property's conservation protection has been removed. The change in protected status is a fundamental land use decision that has the potential for causing ultimate physical changes in the environment. As a result, the act is a "project" under CEQA. (See *Black*, *supra*, 22 Cal.App.4th at p. 985; see also *W.W. Dean & Associates v. City of South San Francisco*, *supra*, 190 Cal.App.3d at p. 1379 ["open space to developable"].)

D.   CLASS 7 AND CLASS 8 EXEMPTIONS

1.   *CONTENTION*

Paulek contends the Class 7 and Class 8 exemptions do not apply to the phase 9 property criteria refinement.

27

## 2. *STANDARD OF REVIEW AND BACKGROUND LAW*

"If the proposed activity is determined to be a project, the public agency must proceed to the second step of the process, which considers whether the project 'is exempt from compliance with CEQA under either a statutory exemption [citation] or a categorical exemption set forth in the regulations [citations]. A categorically exempt project is not subject to CEQA, and no further environmental review is required." (*Save the Plastic Bag Coalition v. County of Marin* (2013) 218 Cal.App.4th 209, 219.)

The categorical exemptions or "class exemptions" were created because the Natural Resources Agency determined some projects, per se, do not have a significant effect on the environment. (*Muzzy*, *supra*, 41 Cal.4th at p. 380.) An agency is precluded "from relying on a categorical exemption when there is a fair argument that a project will have a significant effect on the environment . . . ." (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 266 (*Banker's Hill*); see also *Voices for Rural Living v. El Dorado Irrigation Dist.* (2012) 209 Cal.App.4th 1096, 1105 [applying "fair argument" standard in a Class 3 exemption analysis].) Thus, the agency evaluates potential environmental effects under the fair argument standard, but judicial review "is limited to determining whether the agency applied the standard 'in [the] manner required by law,' " which means the court reviews the record to determine if the agency's fair argument conclusion is supported by substantial evidence. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1115-1116 (*Berkeley*).)

3. *CLASS 7 EXEMPTION*

The Class 7 exemption exempts CEQA projects that "consist[] of actions taken by regulatory agencies . . . to assure the maintenance, restoration, or enhancement of a natural resource." (Cal. Code Regs., tit. 14, § 15307.) Thus, the categorical exemption does *not* apply if there is a fair argument that the criteria refinement may have a significant effect on the environment—if there is a fair argument that the criteria refinement is not assuring the maintenance, restoration, or enhancement of a natural resource. (*Banker's Hill*, *supra*, 139 Cal.App.4th at pp. 266-267.) As explained, *ante*, we examine the record to determine if there is substantial evidence to support the Agency's application of the exemption. (*Berkeley*, *supra*, 60 Cal.4th at pp. 1115-1116.)[3]

We will again assume the Agency's view is correct in that the changes to the phase 9, Reynolds, and Peak properties should be viewed together. On the phase 9 property, a variety of species have been sited, including the California Horned Lark and the Southern California Rufous-crowned Sparrow. The California Horned Lark and the Southern California Rufous-crowned Sparrow have not been sighted on the Reynolds and Peak properties. However, the phase 9 property does have some species in common with the Reynolds and Peak properties, such as bobcats, the Quino Checkerspot Butterfly, the Coastal California Gnatcatcher, and Bell's Sage Sparrow.

---

[3] The Agency determined there was *not* a fair argument that there may be a significant effect on a natural resource. Accordingly, we are applying the substantial evidence standard to a negative finding. We must examine if there is substantial evidence that a fair argument does *not* exist.

The criteria refinement is a trade-off: some species may be maintained while other species may not be maintained. As explained, *ante*, the evidence reflects at least two species are on the phase 9 property that are not on the Reynolds and Peak properties, in particular the California Horned Lark and the Southern California Rufous-crowned Sparrow. There is evidence that the phase 9 property is not a "prime" habitat site for the lark and sparrow; however, there is nothing reflecting that the phase 9 property is superfluous to the species such that there could be substantial evidence to support a fair argument that there may be no significant impact to the species by removing the conservation overlay from the property. In other words, the property may not be "prime" or ideal, but that does not equate with "insignificant" or unneeded. As a result, the evidence does not support the conclusion that there is not a fair argument regarding a significant effect on a natural resource. Therefore, we conclude substantial evidence does not support the application of the Class 7 exemption.

### 4.    *CLASS 8 EXEMPTION*

We now turn to the Class 8 exemption. The Class 8 exemption exempts CEQA projects that "consist[] of actions taken by regulatory agencies . . . to assure the maintenance, restoration, enhancement, or protection of the environment." (Cal. Code Regs., tit. 14, § 15308.) " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.)

As explained, *ante*, the categorical exemption does *not* apply if there is a fair argument that the criteria refinement may have a significant effect on the

environment—if there is a fair argument that the criteria refinement is not assuring the maintenance, restoration, or enhancement of the environment. (*Banker's Hill*, *supra*, 139 Cal.App.4th at pp. 266-267.) We determine if the Agency's decision is supported by substantial evidence. (*Berkeley*, *supra*, 60 Cal.4th at pp. 1115-1116.)

Again, the criteria refinement is a trade-off. The Reynolds and Peak properties may be protected, but the phase 9 property has lost its protected status. The environment may be significantly affected by this trade because the evidence reflects some species are on the phase 9 property, but not on the Reynolds and Peak properties. Additionally, the evidence reflects the neighboring conservation area to the north of the phase 9 property could be disturbed by future development on the phase 9 property. In particular, the evidence reflects, "The new urban edge that will be created by the 200-acre [phase 9] site could affect the Conservation Areas currently existing to the north of the site within Cells 5163 and 5165." Further, "The 200-acre development area has been focused on the very northern part of the Warm Springs [Ranch] Property, in an attempt to lessen edge effects . . . ."

Thus, the evidence provides that the loss of the conservation overlay may affect the neighboring conservation area, and the effects may be significant such that there would need to be an attempt to lessen the effects. This evidence shows an uncertainty about whether there will be a significant impact on the environment. Given the evidence, there is not substantial evidence supporting the finding that a fair argument has not been made that there may be a significant effect on the environment. Therefore, the categorical Class 8 exemption does not apply.

The Agency contends the Class 7 and Class 8 exemptions apply because the evidence reflects the Reynolds and Peak properties are biologically equivalent or superior to the phase 9 property. The Agency's argument fails to explain how it is known that there will not be a significant impact to the environment or a natural resource, when there are species on the phase 9 property that are not on the Reynolds and Peak properties, and when the neighboring conservation area could be affected. We are not concluding that there will be an impact, we are only concluding that there may be an impact, and therefore substantial evidence does not support application of a categorical exemption because the evidence does not refute a fair argument that there may be a significant effect on the environment.

Next, the Agency contends the Class 7 and Class 8 exemptions do not apply because the criteria refinement will result in 1,064 acres being preserved. The Agency is again ignoring the phase 9 property. The Agency is focusing on the Reynolds and Peak properties as though the only action the Agency is taking is adding the conservation overlay to those properties. The Agency is ignoring the other piece of the equation, which is removing the conservation overlay from the phase 9 property.

This court has explained in a prior case, "[A] new regulation that strengthens some environmental requirements may not be entitled to an exemption if the new requirements could result in other potentially significant effects.' " (*California Unions for Reliable Energy v. Mojave Desert Air Quality Management Dist.* (2009) 178 Cal.App.4th 1225, 1240 (*Unions*) [Fourth Dist., Div. Two].) The criteria refinement

involves a trade-off. Some species are on the phase 9 property that are not on the Reynolds and Peak properties. As a result, those species are losing protected habitat in the sense that the land will no longer be protected by the conservation overlay. The fact that other species are gaining protected habitat does not mean there are no potentially significant effects. Since the Agency is not addressing the phase 9 portion of the project, and is focusing on the Reynolds and Peak portions, we find its argument to be unpersuasive.

Next, the Agency asserts the criteria refinement may not significantly impact the California Horned Lark and Southern California Rufous-crowned Sparrow. The Agency does not explain this argument, but we infer from its citation that it is relying on evidence that the majority of the lark's and sparrow's "prime" habitat is on property other than the phase 9 property. The Agency's argument is unpersuasive because, while other property may be more ideal for the lark and sparrow, that does not equate with the phase 9 property being insignificant. There is a big leap from finding property is not "prime" to concluding that any impact to the property is insignificant. The evidence in this case does not support that leap.

Moreover, the Agency's argument is contradicting its own actions. When Anheuser sought to develop the Ranch, the Agency conducted the HANS process and determined all but 71 acres of the Ranch needed to be acquired for conservation. The Agency entered into a Purchase and Sale Agreement to acquire the phase 9 property for conservation purposes at the price of $11,000,000. However, in the meantime, the Agency has agreed to remove the MSHCP conservation overlay from the phase 9

33

property, which removes the protected status from the land.  So, on one hand, the Agency is asserting the phase 9 property needs to be conserved, hence the Agency trying to acquire the property for $11,000,000.  But, on the other hand, the Agency is asserting species may not be impacted by the removal of the conservation overlay/protected status, so it is acceptable to remove the MSHCP conservation overlay without CEQA review.  It is contradictory for the Agency to argue removal of the conservation overlay on the phase 9 property is environmentally insignificant but then take actions reflecting the phase 9 property is needed for conservation, e.g., agreeing to spend $11,000,000.  Simply put, why would the Agency agree to pay $11,000,000 for property it is asserting is unnecessary for preserving species?

Anheuser contends Paulek has incorrectly speculated that construction will occur on the phase 9 property, and therefore Paulek's argument concerning the Class 7 exemption is incorrect.  Anheuser contends the evidence only supports a finding that the phase 9 property will be preserved unless the Agency "is unable to secure the funds to [purchase the property] within the next six years."  We do not interpret Paulek's argument as asserting a belief that construction is guaranteed to happen on the phase 9 property.  Rather, Paulek is explaining the significance of removing the conservation overlay from the phase 9 property, e.g., what it would mean if the phase 9 property lost its protected status.  As this court has explained in a prior case, " 'The scope of review under CEQA is not confined to immediate effects but extends to reasonably foreseeable indirect physical changes to the environment.' "  (*Unions*, *supra*, 178 Cal.App.4th at

34

p. 1242.)  Paulek's argument is focused on the reasonably foreseeable indirect physical changes to the environment.

Anheuser asserts that if a person or entity proposes to develop the phase 9 property, then an environmental assessment can be performed at that time.  In other words, Anheuser is contending applying CEQA at this point is premature.  Anheuser's argument is missing the "thrust of CEQA which requires governmental agencies 'at all levels' to consider environmental factors." (*Bozung*, *supra*, 13 Cal.3d at p. 282; see also *Save Tara v. City of West Hollywood*, *supra*, 45 Cal.4th at p. 129.)  It is useful to have an environmental analysis conducted at the earliest possible stage " 'to enable environmental considerations to influence project, program or design.' [Citation.]" (*Bozung*, at p. 282; see also *Save Tara*, at p. 129.)

Thus, the fact that the removal of the conservation overlay is in the nature of a land use matter, rather than a construction matter, does not control the issue.  CEQA encourages environmental factors to be considered "at all levels"—from land use planning to construction planning.  Considering environmental factors at the land use stage allows possible environmental impacts to be assessed " 'as early as possible in governmental planning.' [Citation.]" (*Bozung*, *supra*, 13 Cal.3d at p. 282, italics omitted.)  Further, we note Anheuser's argument contradicts the findings that the project will benefit the environment.  Logically, if it is too early to determine the project may have a significant negative impact on the environment, then it would also be too early to determine the project will benefit the environment.  (*Unions*, *supra*, 178 Cal.App.4th at

35

p. 1246.)  Accordingly, we are not persuaded that it is too early for CEQA procedures to be implemented.

### E.     COMMON SENSE EXEMPTION

#### 1.     *CONTENTION*

Paulek contends the Agency erred by finding the criteria refinement was exempt from CEQA based upon the "common sense" exemption.  (Cal. Code Regs., tit. 14, § 15061, subd. (b)(3).)

#### 2.     *RULE*

"A project is exempt from CEQA if:  . . . [¶]  . . .  [¶] (3) The activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment.  Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA."  (Cal. Code Regs., tit. 14, § 15061, subd. (b)(3).)  This exemption "is sometimes called the 'common sense' exemption." (*Muzzy*, *supra*, 41 Cal.4th at p. 380.)

#### 3.     *FORFEITURE*

The Agency asserts Paulek forfeited this issue by failing to raise it during the public comment period and failing to raise it in the trial court.

Only issues that were raised during the public comment period may be raised in a CEQA lawsuit.  (§ 21177, subd. (a).)  Additionally, "[a]s a general rule, 'issues not raised in the trial court cannot be raised for the first time on appeal.'  [Citation.]"  (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417.)

36

On January 31, 2012, the Agency gave notice of the February 6th hearing. The February 6th Agency Agenda included the following agenda item: "Adopt and authorize the Chairman to sign Resolution No. 12-002 Resolution of the Board of Directors of [the Agency] Certifying and Approving the Warm Springs Criteria Refinement . . . ." In other words, Resolution 12-002 was the resolution for the phase 9 criteria refinement.

Notably, the resolution contains no reference to exempting the phase 9 criteria refinement from CEQA based upon the "common sense" exemption in California Code of Regulations, title 14, section 15061. The only exemptions included in the resolution are the Class 7 and Class 8 exemptions. (Cal. Code Regs., tit. 14, §§ 15307 & 15308.) The Agency's Board of Directors passed, approved, and adopted Resolution 12-002, containing no reference to the "common sense" exemption.

The resolution reads, "Section 4. Notice of Exemption. Pursuant to State CEQA Guidelines sections 15378 [(defining "project)], 15307 [(Class 7 exemption)], and 15308 [(Class 8 exemption)], the [Agency's] Board of Directors finds that the Warm Springs Criteria Refinement complies with the California Environmental Quality Act. The [Agency's] Board of Directions adopts a Notice of Exemption for the Warm Springs Criteria Refinement and directs [Agency] staff to file and have the Notice posted within five (5) business days as required by CEQA."

The Notice of Exemption listed the three findings by the board of directors: (1) the criteria refinement is not a project; (2) the project is exempt under the Class 7 exemption; and (3) the project is exempt under the Class 8 exemption. However, the

37

Notice of Exemption also included a fourth exemption—the common sense exemption. The common sense exemption was not in the resolution that was listed on the February 6th agenda. Accordingly, we do not find Paulek forfeited his argument related to the common sense exemption by failing to raise it during the public comment period because Paulek had no means of knowing he needed to raise it. The Agency gave no notice prior to the meeting that it was planning to rely on the common sense exemption; the Agency waited until after the vote on the resolution to add the common sense exemption to the Notice of Exemption. (See *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 291 [an agency needs to give notice of the ground for its exemption determination so members of the public have an opportunity to raise concerns].)

At the trial court level, Paulek was alleging error in the Agency's acts of passing, approving, and adopting the resolution. Specifically, Paulek was requesting the trial court direct the Agency to "vacate its approval of the Warm Springs Criteria Refinement and Resolution No. 12-002." The common sense exemption was not in the resolution, and Paulek's lawsuit was about the resolution, so Paulek did not address the common sense exemption in his petition and complaint.

Paulek's lawsuit was properly focused on the resolution, rather than the Notice of Exemption. Section 21167, subdivision (d) provides, "An action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the grounds of noncompliance with this division shall be commenced as follows: [¶] . . . [¶] (d) An action or proceeding alleging that *a public agency has improperly determined* that a project is not subject to this division pursuant to

38

subdivision (b) of Section 21080 . . . shall be commenced within 35 days." (§ 21167, subd. (d), italics added.) Section 21080, subdivision (b)(9) concerns, "[a]ll classes of projects designated pursuant to Section 21084." Section 21084, subdivision (a), includes "classes of projects that have been determined not to have a significant effect on the environment."

Thus, lawsuits should be directed at an agency's determination that a project will not have a significant effect on the environment. In this case, that determination was the passing, approval, and adoption of the resolution, wherein the Agency's Board of Directors found the criteria refinement was not a project, and that if it were a project, then the project was exempt under Classes 7 and 8. Since the lawsuit was properly directed at the resolution, and the resolution does not include the common sense exemption, we conclude Paulek did not forfeit the issue by not raising it in his petition and complaint.

The Agency raised the common sense exemption in its trial court opposition points and authorities; however it melded the common sense argument with its argument related to the criteria refinement not being a project. In Paulek's reply at the trial court, he faulted the Agency for raising the common sense exemption. Paulek asserted (1) the Agency had the responsibility to select one reason the criteria refinement did not require CEQA review, therefore the Agency erred by citing multiple reasons; and (2) substantial evidence does not support the application of the common sense exemption. Accordingly, when the common sense exemption was raised as an

39

issue in the lawsuit, Paulek addressed it. As a result, we conclude Paulek did not forfeit the issue.

### 4. *MERITS*

Although we have explained, *ante*, that the common sense exemption was not included in the resolution, and thus not included in Paulek's lawsuit, we will nevertheless address the merits of the issue for the sake of thoroughness.

As set forth, *ante*, the exemption applies "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment." (Cal. Code Regs., tit. 14, § 15061, subd. (b)(3).) Under this exemption, a plaintiff "need only make a 'slight' showing of a reasonable possibility of a significant environmental impact. [Citation.] It is the lead agency that has the burden of establishing the common sense exemption, i.e., that there is no possibility the project may cause significant environmental impacts." (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 195.) We apply the abuse of discretion standard, which requires us to review the record to determine if the Agency's decision is supported by substantial evidence. (*Creed-21 v. City of San Diego*, *supra*, 234 Cal.App.4th at pp. 511-512.)

The Agency's equivalency report reflects there are species on the phase 9 property that are not on the Reynolds and Peak properties. The report also reflects, "The new urban edge that will be created by the 200-acre [phase 9] site could affect the Conservation Areas currently existing to the north of the site within Cells 5163 and 5165." The report reflects that "The 200-acre development area has been focused on

40

the very northern part of the Warm Springs Property, in an attempt to lessen edge effects . . . ."

Substantial evidence does not reflect there is no possibility the activity may have a significant effect on the environment. Rather, the evidence reflects there could be an effect on the northern conservation areas, and while attempts can be made to lessen the effects, it cannot be concluded there is no possibility that there will be no effects from the decision to remove the MSHCP conservation overlay from the phase 9 property. As a result, we conclude substantial evidence does not support application of the common sense exemption.

The Agency contends the common sense exemption is applicable because development is not planned on the phase 9 property. As set forth, *ante*, it cannot currently be known if the phase 9 property will be preserved or developed. However, also explained, *ante*, the Agency has made a change in the protected land status of the phase 9 property, from being protected to being unprotected. This change in designation embodies a fundamental land use decision that has the potential for causing ultimate physical changes in the environment. (See *Black*, *supra*, 22 Cal.App.4th at p. 985; *Muzzy*, *supra*, 41 Cal.4th at p. 385.)

F.     STATUTE OF LIMITATIONS

The Agency contends Paulek's petition and complaint are time-barred because Paulek exceeded the statute of limitations. Specifically, the Agency asserts Paulek is challenging the Settlement Agreement, and he filed his lawsuit too late to challenge that agreement.

41

There is a 35-day statute of limitations for challenging a public agency's determination that a project will not have a significant effect on the environment and is exempt from CEQA. (§ 21167, subd. (d).) In Paulek's lawsuit, he is attacking the Agency's determinations that (1) the criteria refinement is not a project; (2) the Class 7 exemption applies; and (3) the Class 8 exemption applies. These determinations were made on February 6, 2012, when the Agency passed, approved, and adopted the resolution pertaining to the criteria refinement. Paulek's lawsuit was filed on March 8, 2012. March 8th is less than 35 days after February 6th. Accordingly, we conclude Paulek's lawsuit is timely; he did not exceed the statute of limitations.

The Agency contends the statute of limitations was exceeded because Paulek's arguments regarding the resolution are fundamentally challenging the Settlement Agreement because the criteria refinement is a term in the Settlement Agreement. To the extent the Agency is arguing it contracted away its procedural requirements in the Settlement Agreement by guaranteeing to pass the criteria refinement without CEQA review, such an argument would fail because it is impermissible for an agency to circumvent its procedural requirements via contract. (*Trancas Property Owners Association v. City of Malibu* (2006) 138 Cal.App.4th 172, 182-183.)

To the extent the Agency is arguing Paulek's lawsuit is challenging the Settlement Agreement, that argument also fails. Paulek is challenging the procedure by which the Agency is complying with the Settlement Agreement. The Agency determined it could go forward with the criteria refinement without a CEQA review. Paulek asserts CEQA review is required. For example, a CEQA review may reveal that

42

the Reynolds and Peak properties are not the best mitigation lands. It may be that the criteria refinement goes forward, but an environmental analysis finds other lands will serve to better mitigate the possible loss of the phase 9 property. Thus, Paulek is not asserting the criteria refinement cannot happen; rather, he is asserting the Agency must follow the proper procedures in conducting the criteria refinement. Therefore, Paulek is not challenging the Settlement Agreement because Paulek is not asserting the Agency is barred from conducting the criteria refinement; rather, he is asserting the proper procedures need to be followed in refining the criteria.

G.    JOINDER

The Agency and Anheuser (collectively, defendants) contend Paulek's petition and complaint fail because Paulek did not join the County, and the County is a necessary and indispensible party. Defendants assert Paulek is attacking the Settlement Agreement, and since the County is a signatory to the Settlement Agreement, the County is a necessary and indispensible party in this lawsuit.

Code of Civil Procedure section 389 typically governs a discussion regarding necessary and indispensible parties. However, in a CEQA action, Public Resources Code section 21167.6.5 supplants Code of Civil Procedure section 389 for the "necessary" factor. (*In re Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 855.) "If an entity is a recipient of an approval for purposes of [Public Resources Code] section 21167.6.5(a), that entity is a necessary party in a CEQA action challenging the [environmental impact report] for the project that was approved, and no

43

further showing need be made under subdivision (a) of Code of Civil Procedure section 389 to make that entity a necessary party." (*Id.* at p. 855.)

" 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. . . . Legislative action in regard to a project often constitutes approval." (Cal. Code Regs., tit. 14, § 15352.) "Recipient" is not defined in the Code, so we apply its ordinary meaning—a person who receives or acquires. (Webster's 9th New Collegiate Dict. (1991) p. 983, col. 1.) Thus, "recipient of approval" means one who receives a decision committing an agency to a definite course of action regarding a project.

The County signed the Settlement Agreement with Anheuser, settling their litigation. The signatories to the Settlement Agreement were the County, the Agency, and Anheuser. The Settlement Agreement reflected that the releases in the Settlement Agreement will have no force or effect unless the Agency "has completed its obligations under Section 19(b) of the [Purchase and Sale Agreement], and this has resulted in (a) the elimination of the Cells on the phase 9 Property such that the phase 9 Property will no longer be subject to the HANS process and (b) development of the phase 9 Property is no longer conditioned or restricted by the MSHCP Cells and will not be described for Conservation."

The Agency and Anheuser were signatories to the Purchase and Sale Agreement. The County was not a signatory to the Purchase and Sale Agreement. Section 19(b) of the Purchase and Sale Agreement provides: The Agency "shall use its best efforts to complete and take final action on a 'criteria refinement' process under the MSHCP for

44

the phase 9 Property on or before March 1, 2012. This process shall undertake the elimination of the Cells on the phase 9 Property, the result of which is that the phase 9 Property will no longer be subject to the [HANS] process and will not be described for Conservation."

As explained, *ante*, Paulek's lawsuit is challenging the process used by the Agency in refining the criteria. Paulek is asserting the Agency improperly skipped the CEQA process. Paulek is not contending the Settlement Agreement is wrong or that the criteria refinement can never happen. Rather, Paulek is asserting the Agency must follow the proper procedures. Thus, Paulek is not "undoing" the Settlement Agreement. Rather, Paulek is attempting to "undo" the February 6th resolution, so the Agency can employ the proper process when deciding the criteria refinement issue.

The County was not a "recipient" of the decision to not apply CEQA. The resolution was passed by the Agency. Anheuser is the owner of the phase 9 property. The Agency has an agreement to purchase the phase 9 property from Anheuser by January 2020. The County did not receive the approval of the MSHCP criteria refinement because the County is not a party to the decision, it is not the owner of the property, and it is not the prospective owner of the property. As a result, the County is not the recipient of an approval and is not a necessary party.

Since we have concluded the County is not a necessary party, we do not address whether it is an indispensible party. (*Citizen Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 161-162 [Fourth Dist., Div. Two] [a necessary party is not automatically an indispensible party].)

45

The Agency contends "the County is a 'recipient of approval' . . . because without the Criteria Refinement the County may not rely on the Settlement Agreement." As explained, *ante*, Paulek is not asserting the County must go "without" the criteria refinement. Rather, Paulek is asserting the Agency must follow the proper procedures when deciding the criteria refinement issue. The process was implemented by the Agency and affects property owned by Anheuser. The County is not a necessary party to the issue of whether the proper procedures were followed. Accordingly, we find the Agency's argument to be unpersuasive.

To the extent the Agency is asserting the County is a necessary party because the County's Settlement Agreement guarantees the criteria refinement will be adopted without CEQA review, such an argument fails. As explained, *ante*, the County could not have contracted to guarantee the Agency's criteria refinement resolution would pass without CEQA review. (*Trancas Property Owners Association v. City of Malibu*, *supra*, 138 Cal.App.4th at pp. 182-183.) As a result, nothing in the Settlement Agreement is affected by CEQA procedures being implemented in the Criteria Refinement Process. The lawsuit is not seeking to bar the criteria refinement, it is only seeking to have the Agency follow the proper procedures in deciding the criteria refinement issue.

H.     CONCLUSION

The criteria refinement is a project. Substantial evidence does not support application of the Class 7 and Class 8 exemptions relied upon in the resolution. Therefore, if the Agency seeks to proceed with the criteria refinement, then the Agency

must move to the next step of the analysis and conduct an initial threshold study to see if the criteria refinement will have a significant impact on the environment, in order to determine whether a negative declaration may be issued.  (See *Committee to Save Hollywoodland Specific Plan v. City of Los Angeles*, *supra*, 161 Cal.App.4th at p. 1187.)

## DISPOSITION

The judgment is reversed.  The trial court is directed to grant Paulek's petition for a writ of mandamus and require the Western Riverside County Regional Conservation Authority to (1) vacate and set aside its February 6, 2012, passing, approval, and adoption of Resolution No. 12-002 certifying and approving the Warm Springs Criteria Refinement; and (2) rescind the February 6, 2012, Notice of Exemption concerning the MSHCP Criteria Refinement.  Paulek is awarded his costs on appeal.

CERTIFIED FOR PUBLICATION

MILLER_____
                                                                                                                          J.

We concur:

McKINSTER_____
                          Acting P. J.

KING_____
                            J.

47